**Dr. Stanley C. GRANDON, all others similarly situated and Michael Cafferty, as Trustee for the Grandon Family Irrevocable Trust, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**MERRILL LYNCH & CO., INC. and Merrill, Lynch, Pierce Fenner & Smith, Inc., Defendants–Appellees.**

Docket No. 97–9027.

United States Court of Appeals, Second Circuit.

Argued March 11, 1998.

Decided June 19, 1998.

Christopher Lovell, Lovell & Stewart, LLP, New York City, and Jonathan Kord Lagemann, New York City, for Plaintiffs–Appellants.

A. Robert Pietrzak, Andrew W. Stern and Cathleen M. Tiernan, Brown & Wood LLP, New York City, for Defendants–Appellees.

Before: WALKER, McLAUGHLIN, Circuit Judges, and SWEET, District Judge.*

McLAUGHLIN, Circuit Judge.

## BACKGROUND

This is a class action for securities fraud against Merrill Lynch, Pierce, Fenner & Smith, Inc., a registered broker-dealer with

---

offices throughout the United States, and its New York-based parent company, Merrill Lynch and Co., Inc. (collectively, "Merrill Lynch"). Dr. Stanley Grandon and Michael Cafferty, trustee for the Grandon Family Irrevocable Trust (collectively, "the Plaintiffs"), maintained accounts with and purchased municipal securities from Merrill Lynch.

## A. The Complaint

In an amended class action complaint in the United States District Court for the Southern District of New York (Kram, J.), the Plaintiffs asserted that Merrill Lynch committed securities fraud. The complaint alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5, and 15 U.S.C. § 78t(a) (controlling person liability). The complaint also included state law claims for breach of contract and breach of fiduciary duty.

The specific charge is that Merrill Lynch committed securities fraud in the sales of municipal bonds by: (1) charging the Plaintiffs excessive markups in the form of inflated prices and fees; and (2) failing to disclose either the "true market price" (the prevailing market price) of the bonds or the amount of the markups. The complaint also asserted that Merrill Lynch made implied misrepresentations or omissions by sending the Plaintiffs confirmation statements regarding the municipal bond transactions without disclosing the prevailing market prices of the bonds or the amounts of the fees imposed.

As a general rule, absent countervailing evidence, the best measure of a prevailing market price is the broker-dealer's "contemporaneous cost" for the securities, i.e., the retail market price that the dealer paid for a security in actual transactions close in time to its retail sales. A broker-dealer is entitled to add a reasonable markup on what it paid for the securities.

In alleging that Merrill Lynch charged excessive (and undisclosed) markups, the complaint set forth three specific transactions: (1) On November 22, 1994, the Plaintiffs bought 90,000 municipal bonds at $92.47 per bond. These bonds were described as "Michigan Public Power Agency Rev Ref Belle River PJ–A OID Mar 93, 5.2%, Jan 1 04 bonds." The Plaintiffs contend that Merrill Lynch charged a markup of "approximately 4.6 percent above the true market price" for the Michigan Public Power bonds. (2) On January 19, 1995, the Plaintiffs purchased 60,000 municipal bonds at $87.04 per bond. These bonds were described as "Southfield MI Pub Ses Facs Nov 93, 4.25%, May 1 04." The Plaintiffs contend that Merrill Lynch charged a markup of "approximately 6.3 percent above the true market price" for the Southfield bonds. (3) On August 25, 1995, the Plaintiffs purchased 45,000 municipal bonds at $97.414 per bond. These bonds were described as "Garden City MI Sew Disp Sys Ser B LT MBIA July 95, 5.5%, Nov. 1 11, Interest from 7/1/95, First Coupon 11/1/95." The Plaintiffs contend that the markup for the Garden City bonds was "between approximately 3.7 and 9.74 percent above the true market price" for the Garden City bonds.

## B. The Proceedings Below

Merrill Lynch moved to dismiss the complaint for lack of subject matter jurisdiction, failure to state a claim and failure to plead fraud with sufficient particularity, under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b). With respect to the Plaintiffs' federal claims, Merrill Lynch asserted that: (1) the alleged omissions were not material; (2) the Plaintiffs did not claim reliance on the alleged omissions; (3) Merrill Lynch had no duty to disclose the information at issue; and (4) the Plaintiffs failed to allege scienter. Apparently, Merrill Lynch also asserted that the Plaintiffs failed to plead the federal claims with sufficient particularity. See Fed.R.Civ.P. 9(b). As to the Plaintiffs' state-law claims, Merrill Lynch asserted that: (1) the district court lacked jurisdiction; (2) the Plaintiffs failed to plead the claims with particularity; and (3) the Plaintiffs failed to state a claim for breach of contract.

Judge Kram granted Merrill Lynch's motion to dismiss on the ground that the Plaintiffs failed to state a claim for which relief

could be granted. Fed.R.Civ.P. 12(b)(6). This decision was based solely on the conclusion that Merrill Lynch had no duty to disclose the markups. In her opinion and order, Judge Kram acknowledged that the size of the bond markups was material, stating that "a reasonable investor would have considered disclosure of the fees [which Judge Kram found amounted to $3,885.30, $3,096, and $3,663] important." Judge Kram also presumed that the Plaintiffs relied on the information because "[p]ossession of the omitted information as to the true market price and fee could well have induced [P]laintiffs to seek better terms from Merrill Lynch or other brokers." Judge Kram then held, however, that Rule 10b–5 was not violated because Merrill Lynch had no statutory or regulatory duty to disclose the markups. Finally, Judge Kram concluded that because Merrill Lynch was under no affirmative duty to disclose the alleged omissions, it did not act with scienter in failing to disclose the markups.

Judge Kram did not address whether Merrill Lynch made fraudulent misrepresentations or omissions in the transaction confirmation statements it sent to the Plaintiffs. Also, because she dismissed the complaint under Rule 12(b)(6), Judge Kram did not: (1) rule on whether the Plaintiffs met the stringent pleading requirements of Federal Rule of Civil Procedure 9(b); or (2) decide the merits of Merrill Lynch's statute of limitations defense. Declining to exercise pendent jurisdiction over the Plaintiffs' state law claims, Judge Kram dismissed the complaint in its entirety.

The Plaintiffs appeal. We now vacate and remand.

## DISCUSSION

The Plaintiffs contend that Judge Kram erred in dismissing their securities fraud claim under Rule 12(b)(6), primarily for two reasons: (1) under the circumstances, Merrill Lynch had a duty to disclose the "true market price" or markups of the municipal securities sold to the Plaintiffs, and failed to do so; and (2) Merrill Lynch made implied, material misrepresentations by not revealing the markups on the relevant confirmation

statements it sent to the Plaintiffs. The sole basis for Judge Kram's dismissal was the Plaintiffs' first ground for appeal. Because Merrill Lynch would indeed have had a duty to disclose any excessive markups on the municipal securities, we vacate and remand. We do not reach the Plaintiffs' second ground for appeal, which was not decided below.

### A. Standard of Review

■ We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6). *See, e.g., Chill v. General Electric Co.*, 101 F.3d 263, 267 (2d Cir.1996). In reviewing such a dismissal, we accept as true the factual allegations made in the complaint and draw all inferences in favor of the plaintiffs. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (citing *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993)). Moreover, "[t]he district court should deny the motion [to dismiss] unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984).

### B. Deceptive Practices Prohibited

Section 10(b) of the Exchange Act prohibits sellers of securities from employing "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated under § 10(b), makes it unlawful to make material misstatements or to omit material facts in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. Section 10(b) and the complementary Rule 10b–5 "substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus ... achieve a high standard of business ethics in the securities industry." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (footnote omitted); *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1466 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997).

■ To establish liability under § 10(b) and Rule 10b–5, a plaintiff must prove that: (1) in connection with the purchase or sale of a security; (2) the defendant, acting with scienter; (3) made a material misrepresentation or (where there exists a duty to speak) a material omission, or used a fraudulent device. *See, e.g., First Jersey,* 101 F.3d at 1467; *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 264 (2d Cir.1993); *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993); *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 581 (2d Cir.1990).

■ In the case of an omission, the duty to disclose generally "arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (internal quotation and citation omitted).

■ Under the Exchange Act, the term "municipal securities" covers "a wide variety of obligations, primarily bonds issued by state, local or other political subdivisions or their agencies, including industrial development bonds." 2 Thomas Lee Hazen, *The Law of Securities Regulation,* § 10.5 (3d ed.1995); *see also,* 15 U.S.C. § 78c(a)(29). Historically, the municipal securities market was largely unregulated at the federal level, except in circumstances involving fraud. *See, e.g.,* Hazen, *supra,* § 10.5; Testimony of Paul S. Maco, Director of Office of Municipal Securities, Securities and Exchange Commission, Concerning the Municipal Securities Markets, Before the Committee on Banking and Financial Services, 1995 WL 441680, at *25–26 (July 26, 1995).

■ Particularly because of their "government issue or guarantee," municipal securities generally are exempt from certain registration and reporting provisions of both the Securities Act of 1933 and the Exchange Act. *See* 15 U.S.C. § § 77c(a)(2), 78c(a)(12). Given the tenuous federal presence in the municipal securities market, investors in that market have "substantially less protection" than investors in "the regular securities market." Hazen, *supra,* § 10.5.

## C. *Excessive Markups Prohibited*

■ The markup on a security is the difference between the price charged to the customer and the prevailing market price. *See, e.g., First Jersey,* 101 F.3d at 1469; *Bank of Lexington & Trust Co. v. Vining– Sparks Securities Inc.,* 959 F.2d 606, 613 (6th Cir.1992). The "key issue" in these cases has always been how to determine the "prevailing market price," which is the basis on which retail markups are computed. *Alstead, Dempsey & Co., Inc.,* Exchange Release No. 34–20825, 47 S.E.C. 1034, 1035, 1984 WL 50800, at *1 (April 5, 1984).

■ The prevailing market price generally means "the price at which dealers trade with one another, i.e., the current inter-dealer market." *Id.* When a dealer is not a market-maker, and absent countervailing evidence, the SEC has announced that:

> a dealer's contemporaneous cost is the best evidence of the current market. That standard, which has received judicial approval, reflects the fact that prices paid for a security by a dealer in actual transactions closely related in time to his retail sales are normally a highly reliable indication of prevailing market price.

*Id.* (citing *Barnett v. United States,* 319 F.2d 340, 344 (8th Cir.1963)). *See also In re Codispoti,* 48 S.E.C. 842, 1987 WL 112824, at *3 (Sept. 29, 1987). *Cf.* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation,* 883–84 (3d ed.1995) (hereinafter, "Loss") (when the dealer is a marketmaker, meaning one who typically buys from other dealers at or around its bid and sells to other dealers at or around its offering price, "the contemporaneous cost rule may not be appropriate"). Our Plaintiffs do not allege that Merrill Lynch, with respect to the securities at issue, is a marketmaker.

■ There exists an implied representation that broker-dealers charge their customers securities prices that are reasonably related to the prices charged in an open and competitive market. *See, e.g., Charles Hughes & Co. v. S.E.C.,* 139 F.2d 434, 437 (2d

Cir.1943). A broker-dealer commits fraud (in violation of § 10(b) and Rule 10b–5) by charging customers excessive markups without proper disclosure. *See First Jersey,* 101 F.3d at 1469 (over-the-counter securities); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 835 F.2d 1031, 1033 (3d Cir.1987) (zero-coupon bonds); *Barnett v. United States,* 319 F.2d 340, 344 (8th Cir.1963) (corporate stock); *Charles Hughes,* 139 F.2d at 437 (over-the-counter securities); *Alstead,* 47 S.E.C. 1034, 1984 WL 50800, at *1. *See generally In re Staten Sec. Corp.,* Exchange Act Release No. 34–18628, 47 S.E.C. 766, 1982 WL 32503, at *1–*3 (April 9, 1982) (municipal bonds). This Court long ago accepted the SEC's position that "a dealer cannot charge prices not reasonably related to the prevailing market price without disclosing that fact." *Charles Hughes,* 139 F.2d at 437.

While a broker-dealer may add a markup to the wholesale price it pays for securities, the markup must be reasonable. Whether a markup is excessive must be determined on a case-by-case basis. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1033 (4th Cir.1997) ("[E]ach case requires an independent analysis for determining whether a given markup is reasonable."). A markup is excessive "when it bears no reasonable relation to the prevailing market price." *Bank of Lexington,* 959 F.2d at 613.

The Municipal Securities Rulemaking Board (the "MSRB"), a self-regulating organization created by Congress in 1975, and supervised by the SEC, is the primary regulatory authority in the municipal securities market. 15 U.S.C. § 78o–4(b). The MSRB is authorized to propose and adopt rules to effectuate the purposes of the Exchange Act with respect to transactions in municipal securities. *Id.* § 78o–4(b)(2).

The MSRB has provided no benchmark to aid in determining proper markups for municipal securities. Indeed, the MSRB expressly refused to adopt a specific percentage guideline for a reasonable markup, "in view of the heterogeneous nature of municipal securities transactions and municipal securities dealers." MSRB Interpretations of Rule G–30, "Report on Pricing," (Sept. 26, 1980), MSRB Manual (CCH) ¶ 3646, at 5158 (hereinafter, "MSRB 'Report on Pricing'.") ("[T]he Board is of the view that setting specific numeric guidelines would not be feasible."). A specific benchmark was considered "unworkable" considering the: (1) many differences in municipal securities transactions; (2) size of the transactions; (3) quality and maturities of municipal securities; (4) nature of the services which municipal securities dealers provide; and (5) varying pricing practices of municipal securities dealers in different areas. *Id.* at 5159.

In adopting this hands-off policy, the MSRB suggested that its goal of protecting customers from unfair prices and excessive markups "can be achieved through other means." *Id.* at 5158. The "other means" include MSRB Rule G–30, which requires that prices charged by a municipal securities dealer be "fair and reasonable, taking into consideration all relevant factors." MSRB Rule G–30, MSRB Manual (CCH) ¶ 3646, at 5157. "Relevant factors" enumerated in Rule G–30 include: (1) "the best judgment of the broker, dealer or municipal securities dealer as to the fair market value of the securities at the time of the transaction"; (2) "the expense involved in effecting the transaction"; (3) "the fact that the broker, dealer, or municipal securities dealer is entitled to a profit"; and (4) "the total dollar amount of the transaction." *Id.* The MSRB also recognizes other relevant factors, such as: (5) the availability of the security in the market; (6) the price or yield of the security; and (7) the nature of the professional's business. MSRB "Report on Pricing" at 5160.

Among this welter of considerations, the MSRB stated that the resulting yield to the customer is the "most important" factor in determining whether the price (including the markup) of a municipal security is fair and reasonable. *Id.* ("Of the many possible relevant factors, the Board continues to be firmly of the view that the resulting yield to a customer is the most important one in determining the fairness and reasonableness of price in any given transaction."). The yield to the customer should be "comparable to the yield on other securities of comparable quality, maturity, coupon rate, and block size then

available in the market." *Id.* The MSRB did, however, maintain that all the additional factors noted above may be relevant in making pricing determinations. *Id.* at 5161. *Cf. Banca Cremi,* 132 F.3d at 1033 (enumerating factors relevant in determining whether a markup is reasonable, including: (1) the type of security involved; (2) disclosure; and (3) the pattern of markups or markdowns (quoting 3C Harold S. Bloomenthal, Securities and Federal Corporate Law, App. 12.13 (April 1, 1992))).

█ Given the fact-specific nature of the inquiry under the lissome MSRB Rule G–30, "it is clear that there is no single, fixed definition of what constitutes an excessive markup for all transactions." *S.E.C. v. Feminella,* 947 F.Supp. 722, 729 (S.D.N.Y.1996) (reviewing SEC enforcement action). It appears to be agreed that markups for *equity* securities generally should not exceed five percent of the prevailing market price. *See, e.g., First Independence Group, Inc. v. S.E.C.,* 37 F.3d 30, 32 (2d Cir.1994) (citing NASD Rules, Section 4, Interpretation of the Board of Governors—NASD Markup Policy). It also seems to be accepted that proper markups for municipal bonds are "significantly lower than those for equity securities." *In re Staten,* 47 S.E.C. 766, 1982 WL 32503, at *1. *See also, e.g., Feminella,* 947 F.Supp. at 728–29 (noting proper markups on municipal debt securities "usually are smaller than those on equity securities"); *In re Application of First Honolulu Sec., Inc.,* Exchange Act Release No. 34–32933, 51 S.E.C. 695, 1993 WL 380039, at *4 (Sept. 21, 1993) ("We have long held that markups of over five percent in municipal securities are excessive."); *In re Powell & Associates, Inc.,* Exchange Act Release No. 34–18577, 47 S.E.C. 746, 1982 WL 32339, at *1 (March 22, 1982) ("[m]arkups on municipal bonds are generally a good deal lower" than markups on equity securities). *Cf. F.B. Horner & Assoc. v. SEC,* 994 F.2d 61, 63 (2d Cir.1993) (per curiam) ("A [five] percent markup on this type of fixed income instrument [collateralized mortgage obligation bonds] is quite generous.").

The SEC, however, has categorically stated that the NASD's "five percent policy" does not apply to municipal securities. *In re Staten,* 47 S.E.C. 766, n. 7, 1982 WL 32503, at *1 n. 7. *See also In re First Honolulu,* 51 S.E.C. 695, 1993 WL 380039, at *2 ("[T]he MSRB has specifically avoided adopting a numeric standard for the pricing of municipal securities that is comparable to the NASD's 'five percent' policy."). *But see In re Application of Inv. Planning, Inc.,* Exchange Act Release No. 34–32687, 51 S.E.C. 592, 1993 WL 289728, at *1 (July 28, 1993) ("[I]t has long been recognized that debt securities markups normally are lower than those for equities, and that, in appropriate circumstances, markups under [five percent] may be subject to sanction.").

In this case, the Plaintiffs alleged markups that were 4.6, 6.3, and between 3.7 and 9.74 percent above "the fair market price." To support their claim, the Plaintiffs asserted first, that the fees Merrill Lynch charged on the municipal bond sales were approximately three or more times larger than the fees that Merrill Lynch charged for comparable equity transactions. The Plaintiffs claim this demonstrates a departure from the conventional rule that markups on municipal bonds should be less than markups on comparable equity transactions. *See, e.g., In re Staten,* 47 S.E.C. 766, 1982 WL 32503, at *1.

Second, the Plaintiffs noted that "the secondary market for municipal bonds is 'opaque,'" meaning market prices for municipal bonds are known to brokers but not to public, retail customers. Accordingly, the Plaintiffs claim they were simply unable to ascertain the specific markups charged. Third, the Plaintiffs assert that after they purchased certain bonds, interest rates declined, which in the ordinary course of events would cause the "fair market price" of the bonds to increase. Rather than realizing a gain, however, the Plaintiffs were told that the price of their bonds had actually declined. Plaintiffs assert that this supports their claim that they purchased the bonds from Merrill Lynch at inflated prices.

The district court did not evaluate these claims. Instead, the court dismissed the complaint on the broader ground that a broker-dealer has no duty to disclose even excessive markups. We disagree.

### D. *Duty to Disclose*

Securities brokers are currently required to disclose all markups of *equity* securities under 15 U.S.C. § 10b–10. Curiously, no statutory disclosure requirement applies to the sale of municipal securities. *See* 17 C.F.R. § 240.10b10(a)(2)(ii)(A) and (B); *Banca Cremi*, 132 F.3d at 1033 ("there is no requirement for a broker to disclose the amount of markup charged for a debt security in a riskless transaction"). In 1982, the SEC put a toe in the water but quickly withdrew a proposed regulation requiring dealers to disclose markups in certain debt securities because " 'there are alternative ways of achieving the same goal with fewer adverse side effects.' " *Id.* (quoting Securities Confirmations, Exchange Act Release No. 34–18987, 25 S.E.C. 1223, 1982 WL 35762, at *2 (Aug. 20, 1982)).

To protect against unfair pricing, the SEC has brought administrative actions for fraud, under Rule 10b–5, against securities brokers for charging undisclosed, excessive markups on sales of debt securities. *See, e.g., Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031, 1033 (3d Cir.1987) ("The SEC has established through its enforcement actions the principle that charging undisclosed excessive commissions constitutes fraud."). In these enforcement actions, the SEC has relied on the so-called "shingle theory" of liability. Under this theory, the securities dealer creates an implied duty to disclose excessive markups by "hanging out its professional shingle." *See, e.g., Banca Cremi*, 132 F.3d at 1034 (quoting Reply Br. of the *Amicus Curiae* S.E.C. at 2); Loss, *supra*, at 876–86 (discussing the "shingle theory" and markups).

The Third and Sixth Circuits have recognized a private cause of action, under § 10(b) and Rule 10b–5, for a violation of this implied duty to disclose certain markups (although neither case expressly referenced the "shingle theory"). *See Ettinger*, 835 F.2d at 1036 (finding failure to disclose excessive markups was actionable under § 10(b) and Rule 10b–5); *Bank of Lexington & Trust Co. v. Vining–Sparks Securities Inc.*, 959 F.2d 606, 613 (6th Cir.1992) (recognizing that an undisclosed markup of five percent on municipal

bonds "might sometimes violate Rule 10b–5"). *See also Banca Cremi*, 132 F.3d at 1035–36 (dictum).

In recognizing a private right of action under § 10(b) and Rule 10b–5, the *Ettinger* court noted, "the SEC has established through its enforcement actions the principle that charging undisclosed excessive commissions constitutes fraud." *Ettinger*, 835 F.2d at 1033. This fraud " 'is avoided only by charging a price which bears a reasonable relation to the prevailing price or disclosing such information as will permit the customer to make an informed judgment upon whether or not he will complete the transaction.' " *Id.* (citing *In re Duker & Duker*, Exchange Act Release No. 34–2350, 6 S.E.C. 386, 388–89, 1939 WL 1332 (Dec. 19, 1939)). *See also In re Associated Sec. Corp.*, Exchange Act Release No. 34–6315, 40 S.E.C. 10, 14, 1960 WL 3744 (July 1960), *aff'd*, 293 F.2d 738 (10th Cir.1961); *Charles Hughes & Co.*, 139 F.2d at 437. The *Ettinger* court further held that these administrative proceedings "illuminate the SEC's view as to what constitutes fraud," including the possibility of private actions under Rule 10b–5. *Ettinger*, 835 F.2d at 1033.

The Supreme Court has a rich tradition of interpreting the antifraud provisions of the federal securities laws expansively. *See, e.g., Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (noting that § 10(b) and Rule 10b–5 "are broad, and ... obviously meant to be inclusive"); *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (recognizing that § 10(b) "must be read flexibly, not technically and restrictively"); *United States v. Russo*, 74 F.3d 1383, 1390 (2d Cir.1996) ("[T]he Supreme Court has interpreted Section 10(b) and Rule 10b–5 expansively in accordance with congressional intent to minimize fraud in securities trading.").

We have held previously that sales of securities by broker-dealers carry an implied representation that the prices charged are reasonably related to the prices charged in an open and competitive market. *First Jersey*, 101 F.3d at 1469 (citing *Charles Hughes & Co.*, 139 F.2d at 437). Moreover, we have

held that "a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws." *First Jersey*, 101 F.3d at 1469.

■ True, our decision in *First Jersey* was in the context of an SEC enforcement action regarding excessive markups on over-the-counter securities. The time has come, however, to extend the *First Jersey* principles to private actions arising out of excessive markups on municipal bonds. Specifically, we find that there exists an implied duty to disclose markups on municipal securities when those markups are excessive. *See First Jersey*, 101 F.3d at 1469 ("Sales of securities by broker-dealers to their customers carry with them an implied representation that the prices charged in those transactions are reasonably related to the prices charged in an open and competitive market."); *Ettinger*, 835 F.2d 1031 (implied duty to disclose excessive markups on zero-coupon bonds); MSRB Rule G–30 (requiring broker-dealer to charge municipal bond prices that are "fair and reasonable").

■ Moreover, we find that when a broker-dealer breaches this implied duty to disclose excessive markups, the broker-dealer violates § 10(b) and Rule 10b–5. *See First Jersey*, 101 F.3d at 1469; *Ettinger*, 835 F.2d at 1036 (finding failure to disclose excessive markups on bonds was actionable under § 10(b) and Rule 10b–5); *Bank of Lexington*, 959 F.2d at 613 ("the failure to disclose exorbitant markups on bonds violates [§ 10(b)] and Rule 10b–5"). Finally, we also recognize that a private action under the antifraud provision of § 10(b) and Rule 10b–5 exists against broker-dealers who charge undisclosed, excessive markups on municipal bonds. *See Ettinger*, 835 F.2d at 1036; *Bank of Lexington*, 959 F.2d at 613. *See also, e.g., Herman & MacLean v. Huddleston*, 459 U.S. 375, 380–81, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (recognizing that the existence of a private right of action for fraud under § 10(b) and Rule 10b–5 is "beyond peradventure").

We acknowledge that it might be unduly burdensome to require broker-dealers to disclose markups on bonds in every case. Moreover, we hesitate to trench too heavily into the competitive market of municipal bond sales. It is not for this Court to become a rate-setting body, particularly where the SEC and MSRB have declined, for whatever reason, to impose such rules. Yet we must also seek, under § 10(b) and Rule 10b–5, to protect customers from paying excessive markups that, because they remain undisclosed, are fraudulent. *See First Jersey*, 101 F.3d at 1469; *Ettinger*, 835 F.2d 1031; *Bank of Lexington*, 959 F.2d at 613. In light of the muddy MSRB guidelines, courts and municipal securities dealers are left to determine on a case-by-case basis whether markups on sales of municipal securities are excessive and thereby require disclosure. *See* MSRB Rule G–30; *Banca Cremi*, 132 F.3d at 1033 (requiring independent analysis in each case for determining whether a given markup is reasonable).

■ In assessing whether markups on municipal bonds are, in fact, excessive, we hold that courts should begin with the factors set forth under MSRB Rule G–30. *See* MSRB "Report on Pricing" at 5160. As noted above, relevant factors include, among others: the availability of the security in the market; the price or yield of the security; and the nature of the broker, dealer or municipal securities dealer's business. Although the "fairness and reasonableness determination" under MSRB Rule G–30 is generally fact-based, we anticipate that in some cases a trial court, as a matter of law, properly may conclude that a plaintiff has failed to state a claim that the markups were excessive.

■ This Court "has insisted that a complaint alleging fraudulent violations of section 10(b) and Rule 10b–5 satisfy the particularity requirement" of Federal Rule of Civil Procedure 9(b). *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982); *see also* Fed.R.Civ.P. 9(b) (allegations of fraud must be pled with particularity). A plaintiff's conclusory allegation that markups are excessive is similar to a barroom generality; it is insufficient to state a securities fraud claim. *See Decker*, 681 F.2d at 114 ("conclusory allegations that defendant's conduct was

fraudulent or deceptive are not enough"). A plaintiff must plead with particularity the facts that show the markups to be excessive. *See id.;* Fed.R.Civ.P. 9(b).

In this case the district court never evaluated whether the Plaintiffs properly stated a claim of fraudulent (undisclosed) excessive markups. In particular, the court did not consider the claims in light of the factors under MSRB Rule G–30, for determining whether municipal bond prices are reasonable.

We read the opinion of the district court as dismissing the complaint on the sole ground that broker-dealers have no duty to disclose even excessive markups on municipal securities transactions. As stated above, we reject this conclusion. *Cf., e.g., First Jersey,* 101 F.3d at 1469 ("a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws"); *Bank of Lexington,* 959 F.2d at 613 ("failure to disclose exorbitant markups violates [§ 10(b)] and Rule 10b–5"); *Ettinger,* 835 F.2d at 1033 (charging undisclosed excessive markups constitutes fraud, in violation of § 10(b)). Accordingly, because we find there is a duty to disclose markups on municipal bonds when those markups are excessive, we reverse.

### E. *Implied Misrepresentation Claim*

The Plaintiffs also pleaded that Merrill Lynch made implied misrepresentations. The Plaintiffs assert that Merrill Lynch sent the Plaintiffs confirmation statements regarding the municipal bond transactions without disclosing on those statements the "true market prices" of the bonds or the amounts of the fees imposed. While Merrill Lynch's confirmation statements have a box denoted "charge or mark-up/down," that box is left blank, thereby suggesting, if not indicating, that no markup was charged.

Judge Kram did not determine whether the Plaintiffs properly pleaded that Merrill Lynch, on its confirmation statements, impliedly misrepresented the prices charged in the municipal bond transaction. Therefore, this issue should also be addressed below on remand.

### F. *Scienter*

Merrill Lynch argues that dismissal was proper, in any event, because the Plaintiffs failed to plead sufficiently the requisite element of scienter. *See First Jersey,* 101 F.3d at 1467 (scienter required to establish primary liability under § 10(b) and Rule 10b–5). The element of scienter, as used in connection with the securities fraud statutes, requires a plaintiff to show that the defendant acted with intent to deceive, manipulate or defraud, or at least knowing misconduct. *See id.* (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Herman & MacLean,* 459 U.S. at 382–83, 103 S.Ct. 683; *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir. 1984)). Whether a given intent existed generally is a question of fact. *Id.; Wechsler,* 733 F.2d at 1058–59.

Judge Kram found that Merrill Lynch did not act with scienter because she concluded that Merrill Lynch had no duty to disclose even excessive markups. Because we reject the sweeping conclusion that there is never a duty to disclose markups on municipal bonds, we vacate Judge Kram's finding with regard to scienter.

### G. *Rule 9(b)*

Merrill Lynch also argues that the Plaintiffs' complaint should have been dismissed on the alternate ground that the Plaintiffs failed to plead fraud with particularity, as required under Federal Rule of Civil Procedure 9(b). Specifically, Merrill Lynch argues that the Plaintiffs failed to assert the basis for determining either the "fair market price" at the time of the sale or the amount of the markups.

In dismissing the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), Judge Kram did not determine whether the Plaintiffs had met the stringent pleading requirements of Rule 9(b). Under the circumstances, we believe that this issue should be resolved by the district court in the first instance.

H. *Statute of Limitations*

Merrill Lynch further argues, as it did below, that the Plaintiffs' claims are barred by the statute of limitations. We need not decide that issue because it too was not determined below.

I. *Pendent State Claims*

Finally, Judge Kram dismissed the Plaintiffs' state law claims presumably because she disposed of the federal claims. Because we are reversing the dismissal of the federal claims, we also vacate the dismissal of the pendent state law claims.

### CONCLUSION

Accordingly, based on the foregoing, the judgment of the district court is VACATED and REMANDED.