Selim ABBAD, et al., Plaintiffs,

v.

Robert J. AMMAN, Duncan Lewis, Grier C. Raclin, and Robert A. Schriesheim, Defendants.

No. 02 CIV.4188(LAP).

United States District Court, S.D. New York.

Sept. 30, 2003.

Robert A. O'Hare, Jr., Christopher P. Parnagian, O'Hare, Parnagian, LLP, New York City, David A. Fleissig, New York City, for plaintiffs.

Dennis P. Orr, Joseph De Simone, Matthew D. Ingber, Mayer, Brown, Rowe & Maw LLP, New York City, for defendants.

## MEMORANDUM AND ORDER

PRESKA, District Judge.

Plaintiffs, 103 individual former stockholders of now-bankrupt Global TeleSystems, Inc. ("GTS" or the "company"), bring this securities fraud action asserting in their First Amended Complaint (the "Complaint" or "Compl.") that they were injured by the fraudulent acts of defendants Robert J. Amman ("Amman"), Duncan Lewis ("Lewis"), Grier C. Raclin ("Raclin") and Robert A. Schriesheim ("Schriesheim") (collectively, the "defendants"), in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)") and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), and Section 20(a) of the Securities Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a). Defendants move to dismiss the Complaint on various grounds. For the reasons stated below, defendants' motion is granted.

### BACKGROUND

The facts relevant to the holding, as alleged by plaintiffs in the Complaint and accepted as true for the purposes of the instant motion,[1] are as follows.

### I. The Parties

Plaintiffs are former stockholders of GTS who, at the time of the GTS bankruptcy filing, collectively owned 30,711,347 shares of GTS common stock, representing nearly 12% of the company's issued and outstanding shares. (Compl. ¶ 4; Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint for Violations of Federal Securities Laws, hereafter "Defs' Br.," at 5; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, hereafter "Pls' Br.," at 5).

Defendant Amman was president of GTS from March 1999 until December 2000 and chief executive officer and chairman from September 2000 until October 19, 2001. (Compl.¶ 130). Defendant Lewis was, from December 22, 2000 to October 19, 2001, president and chief operating officer of GTS. (Compl.¶ 131). Defendant Raclin was executive vice president, chief administrative officer, general counsel and corporate secretary of GTS at all relevant times. (Compl.¶ 132). Defendant Schriesheim was executive vice president—corporate development, and chief financial officer of GTS at all relevant times. (Compl.¶ 133).

### II. The November Amendments to Defendants' Employment Agreements

The Complaint alleges that on or about November 1, 2000, defendants Amman, Raclin and Schriesheim caused GTS to enter into Amended and Restated Employment Agreements with them which significantly increased their compensation and, in particular, provided Raclin and Schriesheim with the opportunity to receive substantial "Severance Payments" upon their voluntary resignation from GTS (which would be treated as "Termination without Cause" by the company) "on or after October 1, 2001." (Compl.¶¶ 146–154).

### III. The Restructuring of GTS

On November 13, 2000, GTS issued a press release reporting its third quarter

---

1. *See Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (factual allegations in plaintiff's complaint are accepted as true).

2000 results. (Compl.¶ 158). In that press release, defendants reported that GTS intended to "restructure its operations to focus on the company's core competency of providing broadband service to carriers, ISPs, ASPs, Web-centric entities and pan-European corporations." (Compl.¶ 159). To "implement this new strategy," GTS announced that it would "manage the company as four 'stand-alone' business units"—(1) GTS Broadband Services (known as "Ebone"), the company's "crown jewel;"[2] (2) GTS Business Services, its Western European voice business; (3) GTS Central Europe; and (4) Golden Telecom, its Russian business— and that it would "seek to sell its voice-based Business Services unit, as well as its Central Europe unit. . . ." (*Id.* ¶ 159). GTS reported that the "objective" of the restructuring was to

> 1) unlock the value of this highly EBIT-DA positive business by creating a pure play data company which is today the leading provider of broadband services in Europe and
>
> 2) generate proceeds and reduce overall cash requirements from the potential sale of non-core, non-strategic businesses, which can be redirected to our core business.

(*Id.*).

### IV. The January Amendments to Defendants' Employment Agreements

In January 2001, Amman, Raclin and Schriesheim again caused GTS to enter into further amendments of their employment agreements (the "Letter Agreements"). (Compl.¶ 164). As set forth in the Complaint, the Letter Agreements provided Amman, Raclin and Schriesheim with the opportunity to collect additional performance bonuses upon the completion of certain actions comprising the restructuring and additional financing of the company. (*Id.*).

### V. The June Amendments to Defendants' Employment Agreements

According to the Complaint, on June 23, 2001, defendants Amman, Raclin and Schriesheim caused the company to enter into further amendments to their employment agreements. (Compl.¶ 235). The amendments provided for a 160% increase of their annual base salaries as of July 1, 2001 and the payment of "retention bonuses" in the aggregate amount of $5.5 million. (*Id.*). The agreements also provided those defendants with the right to "Special Restructuring Bonuses" tied to the sale of GTS' assets. (*Id.*).

### VI. GTS' Bankruptcy Filing

In a press release issued October 19, 2001, GTS announced that it had signed a definitive stock purchase agreement with KPNQwest whereby KPNQwest would acquire Ebone and that "to ensure the binding nature of the sale agreement on all bondholders, GTS expects that the transaction will be effectuated through a 'prearranged' [bankruptcy proceeding]." (Compl.¶¶ 322–23). On November 14, 2001, the company filed for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. (Compl.¶ 328).

### VII. The Instant Action

On June 3, 2002, plaintiffs filed their original complaint. On September 18, 2002, plaintiffs filed the Complaint alleging violations of Section 10(b), Rule 10b–5, and Section 20(a). The thrust of plaintiffs' complaint is that defendants, having determined that GTS would not remain a viable

---

**2.** *See* Compl. ¶ 3.

company after October 2001, hatched a secret plan in October 2000 to recapture as much of the value of the company as possible for themselves while misleading the stockholders into believing that the company's condition was not as dire as it in fact was.[3] By notice of motion filed October 15, 2002, defendants moved to dismiss the Complaint.

## DISCUSSION

### I. Legal Standards

#### A. Motion to Dismiss

In deciding a motion to dismiss, the complaint must be viewed in the light most favorable to the plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985). All well-pleaded factual allegations of the complaint must be accepted as true. *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (referring to "well-pleaded allegations"); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). Dismissal is proper only when "it appears beyond doubt that the [pleader] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994).

#### B. Section 10(b) and Rule 10b–5

In order to state a claim under Section 10(b) and Rule 10b–5 promulgated there-

under, plaintiffs must plead that defendants, " 'in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff[s'] reliance on the defendant[s'] action caused injury to the plaintiff.' " *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000)); *see also Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 189 (2d Cir.1998).

#### C. Rule 9(b)

Rule 9(b) provides, in pertinent part, that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). A complaint alleging violations of Section 10(b) and Rule 10b–5 must satisfy the particularity requirement set forth in Rule 9(b). *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (citing *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982)). To satisfy this requirement, the Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993))).

Rule 9(b) also provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred general-

---

**3.** Plaintiffs take issue with the "secret plan" characterization. They characterize their central allegation as being that "[d]efendants in November 2000, concluded that GTS would not be able to continue as a going concern beyond the third quarter of 2001 and embarked on a scheme to capture for themselves as much of FTS' remaining value before its collapse." Pl. Br. at 1. The difference escapes me.

ly." Fed.R.Civ.P. 9(b). The Court of Appeals in *Shields* noted that

> since Rule 9(b) is intended "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit ...", the relaxation of Rule 9(b)'s specificity requirement for scienter " 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.' "

*Shields*, 25 F.3d at 1128 (internal citations omitted). Therefore, to give meaning to the overall purpose of Rule 9(b), a fraud plaintiff must "allege facts that give rise to a strong inference of fraudulent intent," which can be accomplished either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.; see also Wells Fargo Bank Northwest N.A. v. Taca Int'l Airlines,* 247 F.Supp.2d 352, 364–65 (S.D.N.Y.2002); *Stevelman,* 174 F.3d at 84. The Private Securities Litigation Reform Act of 1995 ("PSLRA") adopts this heightened pleading standard for scienter in securities fraud actions. *See* 15 U.S.C. § 78u–4(b)(1), (2) (setting out the requirements for pleading securities fraud actions, including the requirement that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

Here, the Complaint specifies a multitude of statements, made over the course of nearly a year, from October 31, 2000 through October 19, 2001, that plaintiffs contend are false or misleading. The Complaint also identifies the speaker of the statements, as well as the time frames in which they were made. Accordingly, plaintiffs have satisfied the "time, place, speaker, and ... content of the alleged misrepresentation" requirements. *Shields,* 25 F.3d at 1129 (quoting *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990)). Conspicuously absent, however, are facts going to the "why" requirement—*viz.,* facts that give rise to a strong inference of fraudulent intent. *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999).

Plaintiffs' entire action is based on the assertion that in or about October of 2000, the defendants determined that the company could not survive, decided to conceal that information and formulated a plan to milk as much from the company for themselves as they could before its demise. Defendants liken this case to *Fant v. Perelman,* 97 Civ. 8435, 1999 WL 199078 (S.D.N.Y. Apr.9, 1999). There, the plaintiffs, a group of Marvel Comics stockholders, alleged that the defendants, board members of Marvel, had formulated a plan for Marvel's restructuring and concealed that plan for months while they fraudulently omitted details of the plan in press releases. *Id.* at *4.

> Put another way, plaintiffs [knew] one 'fact'—on November 12, Marvel announced a proposed restructuring plan. From this, they speculate that defendants must have formulated that plan in October, that they concealed that plan in October and that such concealment must have been done with scienter.

*Id.* There, such a "house of cards [could not] support a claim for securities fraud." *Id.*

The instant case, defendants contend, is substantively indistinguishable. (Defs' Br. at 2, 21–22). The "one fact" plaintiffs know is that on October 19, 2001, GTS announced the sale of Ebone to KPNQwest. From that, plaintiffs have traced back in time through the events of

the year preceding, with the *ipse dixit* that defendants formulated and concealed a plan to sell Ebone almost a year earlier. Indeed, the complaint states precisely that:

> The scheme to defraud GTS stockholders began on or about October 31, 2000 and continued through the end of the Period. *Amman, Schriesheim and Raclin concluded by October 31, 2000 that the Company would not be able to survive as a going concern beyond the third quarter of 2001. Thus, they formulated a plan to capture for themselves as much of the Company's remaining value as possible before the Company's planned collapse.* To set the stage for the restructuring, the Company was divided into four stand-alone business units: Ebone, GTS Business Services (also known as "Esprit"), GTS Central Europe and Golden Telecom. The plan involved three major elements: first, conducting a fire sale of Company assets, not in order to restructure and streamline the Company so that it could go forward as Defendants represented to the investing public and other constituencies, but rather to generate the case necessary to meet the Company's debt obligations over the next year until the Company's primary asset and core business—the division that would become known as Ebone, with its highly valuable customer base—could be sold off. The second element of the plan involved changing Defendants' compensation plans over the Period so that they could drain as much money as possible from the Company during its demise (a period which Defendants would refer to as the Company's "restructuring"), keeping these changes secret as long as possible to avoid tipping off the Company's stockholders, customers and other constituencies that something was amiss. The final element involved misleading the Company's constituencies into believing that the "restructuring" was working, persuading them to ignore whatever bad news appeared in the Company's SEC filings and thereby maintaining Ebone's customer base (and a market for GTS' common stock) until that asset could be sold off (to the Defendants' individual profit) in the third quarter of 2001.

(Compl. ¶ 5). According to defendants, the sorts of claims put forth in the instant case are no different from the claims considered, and rejected, in *Fant*.

Not so, plaintiffs assert. Plaintiffs admit that *Fant* "is a true example of pleading by hindsight." (Pls' Br. at 18). However, they insist that the instant case "is completely different." (*Id.*). Plaintiffs rely on two allegations to fulfill the scienter requirement, that is, to allege *facts* giving rise to a strong inference of fraudulent intent—here, that defendants knew that the company would not survive and hatched a secret plan to milk it. First, in an effort to allege scienter through pleading motive and opportunity, plaintiffs point to the employment agreements negotiated by certain defendants in the November 2000 to June 2001 time period. Because those agreements provided for bonuses tied to certain corporate restructuring events, plaintiffs assert that they demonstrate a motive for defendants' alleged fraudulent behavior. (Defendants do not assert lack of opportunity on this motion.) Second, in an effort to allege scienter through pleading facts constituting strong circumstantial evidence of conscious misbehavior or recklessness, plaintiffs point to a statement by Amman contained in an October 19, 2001 press release, to the effect that the sale of Ebone to KPNQwest represented "the completion of the consensual restructuring process" that GTS began "late last year." (Compl. ¶ 322). Neither attempt is sufficient.

*Motive*

██ Assuming defendants' knowledge that the company could not survive, plaintiffs assert that Amman, Raclin and Schriesheim were motivated to embark on a scheme to defraud in October 2000 "to guarantee the receipt of the bonuses in their employment agreements, which were tied—not to the successful operation of the company in the stockholders' interest—but to the successful dismantling and liquidation of the company". (Compl.¶ 8). Plaintiffs pepper the complaint with allegations such as

> In an effort to ensure that they would not suffer personally from what would ultimately be the demise of GTS, on or about November 1, 2000, Amman, Raclin and Schriesheim caused the Company to enter into Amended and Restated Employment Agreements with them, which significantly increased their compensation and, in particular, provided Raclin and Schriesheim with the opportunity to earn substantial bonuses following the completion of the fire sale of assets that ultimately resulted in the liquidation of the Company in a prepackaged bankruptcy. Compensation was not linked to Company success or the enhancement of stockholder value, but to the success of a restructuring that would profit management and leave stockholders with nothing;

(Compl.¶ 147); and

> Defendants knew that [GTS's Senior Vice President's] departure for KPNQwest virtually ensured that KPNQwest would go forward with its plans to acquire GTS's Ebone and Central Europe divisions from the Company. To exploit this inside information, and to enrich themselves at stockholders' expense, Defendants Amman, Raclin and Schriesheim caused the Company to enter into further amendments to their

> employment agreements, dated as of June 23, 2001 ... providing for a 160% increase of their annual base salaries as of July 1, 2001 ... and the payment on July 1, 2001 of "retention bonuses" in the aggregate amount of $5.5 million.... Assuming payment of the full annual salaries and the target bonuses of $3 million, these Defendants were now poised to make $20.975 million—about 52% of the total market capitalization of the Company as of June 23, 2001.

(Compl.¶ 235).

As a matter of fact, however, the employment agreements are insufficient to support a finding of motive. Two of the defendants' November employment agreements—Raclin's and Schriesheim's—allowed the executives to resign voluntarily from the company while receiving severance commensurate with a "Termination Without Cause," so long as appropriate notice was provided and certain "Restructuring Actions" completed. *See* 2000 Form 10–K, Ex. 10.18 & 10.19 (Orr Aff. ¶ 2, Ex. A). None of these Restructuring Actions, however, included a sale of the company or of Ebone, and thus, at the time defendants allegedly embarked on their supposed secret plan, none of the defendants stood to gain from such a sale. (*Id.*).

Plaintiffs' allegation that Amman's compensation under the November employment agreement was linked to the completion of the restructuring actions, or to the sale of Ebone, is simply wrong. There is no reference to the restructuring actions in Amman's employment agreement. *See* 2000 Form 10–K, Ex. 10.17 (Orr.Aff.¶ 2, Ex. A). Lewis, on the other hand, was not even employed by the company in October of 2000 when the supposed scheme was hatched. *See* Compl. ¶¶ 5, 131. After Lewis was retained by the company in late December, at no point during the relevant

period was his compensation linked to the successful completion of the restructuring, much less to the sale of Ebone to KPNQwest. *See* Lewis Employment Agreement, at 7–8 (Orr Aff. ¶ 6, Ex. E).[4]

The January and June employment agreements are also insufficient to support an inference of fraud. Under the January agreements, Amann's, Raclin's and Schriesheim's compensation was linked, in part, to certain restructuring actions, none of which included a potential sale of GTS or Ebone. *See* March 2001 Form 10–Q, Exs. 10.17, 10.18, 10.19 (Orr Aff. ¶ 9, Ex. H) (restructuring targets limited to elimination of Business Services debt, potential sale of GTS Central Europe or Golden Telecom, and financing for Ebone). Indeed, one of the restructuring actions to which compensation was linked was obtaining financing for Ebone so that it could continue as a going concern. *Id.* The publicly available documents thus demonstrate that those defendants' motives could only have been the opposite of what is alleged in the complaint.

Only the June employment agreements make any reference to the potential sale of the company (although not specifically to the sale of Ebone). Critically, however, the June agreements entitled defendants to "Special Restructuring Bonuses"—only a small portion of their total compensation—irrespective of whether the company was sold. *See* June 2001 Form 10–Q/A, Exs. 10.1, 10.2, 10.3 (Orr Aff. ¶ 8, Ex. G) (allowing defendants to receive "Special Restructuring Bonus" upon a restructuring of the balance sheet *or* a sale of the company). Thus, based on the various employment agreements, Amman,[5] Raclin and Schriesheim were no more motivated to sell the company than they were to restructure the balance sheet without effecting a sale. In other words, because defendants could have received their "Special Restructuring Bonus" even without selling Ebone, plaintiffs' allegations of motive are insufficient as a matter of fact.

As a matter of law, "an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir.2001) (citing *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995)); *see*

---

**4.** Plaintiffs' most recent allegation of motive against Lewis, which was absent from their original complaint, is that certain undisclosed, former employees of GTS and KPNQwest have "revealed" that Lewis received "severance and/or retention compensation of at least $3 million ... in exchange for his agreement to facilitate the prenegotiated (or 'prepackaged') bankruptcy and sale to KPNQwest." Compl. ¶ 6. This allegation—that Lewis somehow acquired the motive to commit fraud as of an undefined date *after* Amman, Raclin and Schriesheim hatched their "secret plan"—is a naked assertion without the requisite particularity. Indeed, plaintiffs have not even alleged that Lewis made any such agreement during the relevant period. In any event, Lewis' employment agreement not only fails to support an inference of any intent to defraud on his part but demonstrates that Lewis had every incentive to ensure that

GTS would continue as a going concern because he was slated to become its chief executive officer after the Restructuring was completed. *See* Lewis Employment Agreement, at 6 (Orr Aff. ¶ 6, Ex. E).

**5.** I note that Amman actually *purchased* 270,-000 shares of GTS common stock in December 2000 after the time defendants are allegedly to have determined that the company could not survive. See Form 4, Robert Amman (Orr Aff. ¶ 14 Ex. M). That fact defeats any inference that Amman knew that GTS would become "nothing but an empty shell" with worthless stock. Also, none of the defendants sold shares during the relevant period, thus negating any inference of scienter. *See, e.g., Acito,* 47 F.3d at 54; *In re Symbol Tech. Class Action Litig.,* 950 F.Supp. 1237, 1245 (E.D.N.Y.1997).

also *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 702 (S.D.N.Y.2000). *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir.1994) (stating that acceptance of such allegations of proof of scienter "would effectively eliminate the state of mind requirement as to all corporate officers and defendants"); *In re Trex Co. Sec. Litig.*, 212 F.Supp.2d 596, 607 (W.D.Va.2002) (rejecting scienter argument because the allegations "concern motivations common to all corporate officers. Every corporate officer wants to meet analysts' expectations, and every corporate officer wants a bigger bonus.").

Here, bonus compensation was offered to these defendants to induce them to stay with the company and complete a restructuring. Such restructuring or retention bonuses are common in financially troubled companies, *see In re Trans World Airlines, Inc.*, 185 B.R. 302, 310–11 (Bankr.E.D.Mo.1995) (holding that restructuring bonus compensation plan, pursuant to which payments would be made to key executives for achieving a successful restructuring, was reasonable where the bonuses were granted by unanimous approval of debtor's board of directors and on recommendation of its compensation committee); *see also In re Bidermann Indus. U.S.A.*, 241 B.R. 76, 78 (Bankr. S.D.N.Y.1999) (observing that employees received bonuses for the restructuring of a company "to ensure a smooth transition by inducing employees to remain with [the Debtor] until a specified date"), and serve a useful function by inducing experienced executives to remain with troubled companies to try to turn them around.

Accepting plaintiffs' argument that the restructuring bonuses are a sufficient basis from which to infer a motive to defraud would effectively eliminate the use of such agreements; executives would fear that if the restructuring failed, the executives (not being clairvoyant) would automatically become defendants. This would not serve the policy behind the securities laws—which Congress determined in the PSLRA required a high level of specificity in pleading scienter—or the shareholders' interest in retaining the services of the executives most likely to turn around ailing companies and regain value for the shareholders.

*Conscious Misbehavior or Recklessness*

■ Even assuming *arguendo*, that this case does not fall within the rubric of cases holding executives' desire for compensation is insufficient to constitute motive, equally fatal to plaintiffs' complaint is that their claims with respect to the employment agreements are premised on the existence of the secret plan to make those agreements worthwhile. For example, plaintiffs claim that

> The inclusion in the Raclin and Schriesheim Amended Employment Agreements of provisions treating Raclin's and Schriesheim's resignation on or after October 1, 2001 as "Termination[s] without Cause" (entitling Raclin and Schriesheim to substantial "Severance Payments") demonstrates that Amman, Raclin and Schriesheim knew, by November 1, 2000, that GTS would not continue as a going concern beyond the third quarter of 2001.

(Compl.¶ 157), and that

> Amman, Raclin and Schriesheim engineered the execution of the Agreements Regarding Certain Compensation because they knew that the Company would not continue as a going concern, and would seek the protection of the bankruptcy courts to consummate the planned sale of Ebone and Central Europe to KPNQwest.

(Compl.¶ 236). Plaintiffs assert that defendants have admitted to such a plan in Amman's statement in the October 19, 2001 press release to the effect that the

sale of Ebone represented "the completion of the consensual restructuring process" that GTS began "late last year." (Compl. ¶ 322; Pl. Br. 18–19). Plaintiffs thus point to this statement as evidence of conscious misbehavior or recklessness.

In *Shields,* the Court of Appeals upheld the dismissal of a Section 10(b) action for failure to plead fraud with specificity. *Shields,* 25 F.3d 1124 (2d Cir.1994). In discussing the deficiencies of plaintiff's complaint, the Court of Appeals noted that

> [The plaintiff's] pleading technique is to couple a factual statement with a conclusory allegation of fraudulent intent. For example, [plaintiff] claims that defendants "knew or were reckless in not knowing" that the loan loss reserve was inadequate; that defendants: "intentionally concealed" the vulnerability to real estate losses inherent in shared appreciation loans; that defendants "knew but concealed" the poor condition of Citytrust's loan portfolio; and that defendants "knew or should have known" that Citytrust's loan problems were growing worse and that the loan loss reserve would have to be increased a second time. However, she does not allege facts that would give rise to a strong inference that defendants knew or recklessly disregarded the fact that the loan loss reserve was inadequate, or that continuing erosion of the real estate market would render the loan portfolio precarious, or that the outlook was poor.

*Id.* at 1129. In sum, plaintiff's "frequent conclusory allegations" were found "not [to] satisfy the requirements of Rule 9(b)" because, "in the context of securities fraud claims ...[,] such allegations are 'so broad and conclusory as to be meaningless.'" *Id.* (quoting *Decker,* 681 F.2d at 119–20).

Similarly, in *Fant,* the complaint was inadequate because in that Section 10(b) action,

> Taking a page from the *Shields* book, plaintiffs have merely alleged their conclusion that defendants necessarily must have known and thus concealed in October the details of the proposal announced November 12. No facts supporting this conclusion are pleaded.

*Fant,* 1999 WL 199078, at \*10.

Here, plaintiffs employ the same technique in attempting to plead conscious misbehavior or recklessness; they juxtapose the announcement of the restructuring in November 2000 with the announcement of the sale of Ebone in October 2001 and conclude that defendants must have known in November 2000 that Ebone, the company's crown jewel, would have to be sold in 2001. As noted above, the plaintiffs point to Amman's statement in the October 19, 2001 press release to the effect that the sale of Ebone represented "the completion of the consensual restructuring process" that GTS began "late last year as an admission that defendants knew in 2000 that the company would not survive through 2001 and would be sold." (Compl.¶ 322). Amman's statement, however, does nothing more than announce the end of the publicly disclosed restructuring process. Just as in *Fant,* it is wholly insufficient to plead conscious misbehavior or recklessness, especially with the particularity required by Rule 9(b).

In all, far from being "completely different" from *Fant,* the instant case fits squarely into the legion of cases wherein investor plaintiffs, disappointed in the outcome of their investment, conclude that somewhere, sometime in the past, a plan was hatched without their knowledge and that subsequent events and statements were all fraudulent attempts to keep the plaintiffs from uncovering the secret plan. *See, e.g., Stevelman,* 174 F.3d at 85 ("fraud by hindsight" insufficient to form a basis for a securities fraud complaint); *Novak,*

216 F.3d at 309 (same); *Acito,* 47 F.3d at 53 ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.... defendants' lack of clairvoyance simply does not constitute securities fraud." (citations omitted)). *Fant,* 1999 WL 199078, at *10 (fraud by hindsight insufficient); *In re Livent Sec. Litig.,* 148 F.Supp.2d 331, 371 (S.D.N.Y.2001) (same). Here, as in all of those cases, while the existence of the plan "may be 'obvious' to plaintiffs, it is by no means obvious—or even apparent—to me." *Fant,* 1999 WL 199078, at *10. Plaintiffs here employ the same deficient technique as those other plaintiffs. They repeat conclusory allegations premised on the existence of a secret plan by defendants to the effect that defendants, for their own personal gain, led the company along a year-long course towards predestined destruction. The law, however, requires considerably more. Accordingly, plaintiff's Section 10(b) is dismissed for failure adequately to plead scienter.[6]

III. Section 20(a)

 Section 20(a) provides,

(a) Joint and several liability; good faith defense. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

**6.** In light of the above dispositive holding, I reserve on defendants' other arguments as to

15 U.S.C. § 78t(a). As discussed above, plaintiffs have failed to state a primary violation of the securities laws under section 10(b). Without a primary violation, there can be no secondary, or derivative, violation under Section 20(a). *See Shields,* 25 F.3d at 1132; *Brown v. Hutton Group,* 795 F.Supp. 1317, 1324 (S.D.N.Y.1992). Accordingly, plaintiffs' Section 20(a) claim is also dismissed.

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (docket entry no. 12) is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED