**JSC FOREIGN ECONOMIC ASSO-CIATION TECHNOSTROYEX-PORT, Plaintiff,**

v.

**INTERNATIONAL DEVELOPMENT AND TRADE SERVICES, INC.; Edith Reich, Brigitte R. Jossem, also known as Brigitte Jossem–Kumpf; M & B Oxford 41, Inc.; P & F Equities, Inc.; and Atrium Square, Inc., Defendants.**

No. 03 CIV. 5562(JGK).

United States District Court, S.D. New York.

Dec. 20, 2003.

Ira M. Feinberg, Hogan & Hartson, L.L.P., New York, NY, for Plaintiff.

Ari S. Zymelman, Christopher N. Manning, Jonathan P. Graham, Williams & Connolly, L.L.P., Washington, DC, for Defendants.

## OPINION and ORDER

KOELTL, District Judge.

This diversity action is part of a resumed effort by the plaintiff, JSC Foreign Economic Association Technostroyexport ("Techno"), to enforce a judgment by this Court entered on July 29, 1997, confirming two Russian arbitration awards against the

defendant International Development and Trade Services, Inc. ("IDTS"). The judgment was affirmed by the Court of Appeals for the Second Circuit. *See AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980 (2d Cir.1998).[1] The plaintiff's original attempt to enforce the judgment, which now exceeds $200 million with interest, was unsuccessful, and the case was administratively closed by Magistrate Judge Peck on December 6, 1999.

On July 28, 2003, the plaintiff filed a new complaint initiating this action, and it now seeks to collect on the judgment not only from IDTS, but also from defendants Edith Reich ("Reich") and Brigitte Jossem ("Jossem"), who are alleged to be the alter egos of IDTS, and from certain other entities that are alleged to be the alter egos of Reich and Jossem.

The Complaint asserts nine claims for relief. The first claim for relief alleges that Reich and Jossem are liable for the debts of IDTS, including the prior judgment, because they are allegedly IDTS's alter egos. (Compl.¶ 28.) The third and fifth claims for relief are brought under New York's Debtor and Creditor Law § 273–a, and they seek to set aside allegedly fraudulent conveyances made by Jossem while she was allegedly an alter ego of the judgment debtor IDTS. (Compl.¶¶ 58–59, 69–70.) The fourth and sixth claims for relief seek reasonable attorneys' fees pursuant to N.Y. D.C.L. § 276–a that are incurred in proving that Jossem and the entities to which she conveyed property did so with the intent to hinder creditors. (Compl.¶¶ 61–62, 72–73.) The second and seventh claims for relief allege that defendants M & B Oxford and Atrium Square are the alter egos of Reich and Jossem and

are liable for their debts. (Compl.¶¶ 48–49, 78–79.) The eighth and ninth claims for relief are brought under New York's Business Corporation Law § 720, and they assert breach of fiduciary duty claims against Reich and Jossem in their roles as officer and director, respectively, of IDTS. (Compl.¶¶ 87–88, 95–96.)

On September 5, 2003, the plaintiff moved by an order to show cause why a preliminary injunction should not be issued pursuant to Federal Rule of Civil Procedure 65 enjoining the defendants from transferring or otherwise disposing of certain assets that could allegedly be used to satisfy the judgment. The parties appeared before the Court on September 8, 2003, and a briefing schedule was set for the plaintiff's motion for a preliminary injunction and for motions made by the defendants. The defendants have moved both to dismiss the Complaint in its entirety and to compel arbitration. The defendants have also moved to vacate or modify the restraining notices issued by the plaintiff's counsel, and to prevent further issuance of such restraining notices. This Opinion and Order disposes of all the pending motions.

### I.

The first motion to be addressed is the defendants' motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. On a motion to dismiss, the allegations in the complaint are accepted as true. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). In deciding a motion to dismiss, all reasonable inferences are drawn in the plaintiff's favor. *See Gant v. Wallingford Bd. of Educ.*, 69

---

1. Techno maintains that it is the legal successor of AAOT Foreign Economic Association (VO) Technostroyexport. (Compl.¶ 7.) For the purposes of the pending motions, the defendants accept this claim as true; however, they have reserved the right to challenge the plaintiff's standing to bring this action.

F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, the defendants' motion to dismiss should be granted only if it appears that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Grandon*, 147 F.3d at 188; *Goldman*, 754 F.2d at 1065.

In deciding the motion, the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002); *see also Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991); *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F.Supp.2d 435, 437 (S.D.N.Y.2001).

## II.

The factual background of the case leading up to the prior judgment is fully set forth in *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980 (2d Cir.1998), familiarity with which is assumed.

The following facts, as alleged in the Complaint, are accepted as true for the purposes of this motion. Techno is a Russian corporation with its principal place of business in Moscow, Russian Federation. (Compl.¶ 7.) IDTS is a corporation orga-

nized in April 1989 under the laws of the State of New York. (Compl.¶ 8.) Reich is a New York resident, who at all relevant times has been the president of IDTS. (Compl.¶ 2, 9, 30.) Jossem, also a New York resident, is Reich's daughter, and at all relevant times has been the sole shareholder and sole director of IDTS. (Compl.¶ 2, 10, 31.)

The plaintiff alleges that Reich and Jossem kept IDTS inadequately capitalized from the time of its incorporation. (Compl.¶ 29.) Reich and Jossem also allegedly failed to observe required corporate formalities, including their failure to file and pay corporate franchise taxes or to hold any shareholders' or directors' meetings. (Compl.¶ 33.) Reich and Jossem allegedly dominated and controlled the actions of IDTS, made all decisions on its behalf, and used that control to further their own personal interests. (Compl.¶ 32.)

For example, between October 1991 and August 1992, Reich allegedly diverted to an account in her own name approximately $15 million that would ordinarily have been deposited into IDTS's Swiss bank account. (Compl.¶ 34.) Reich and Jossem also allegedly regularly used IDTS funds for personal uses, including attorney's fees incurred in defending Reich in probation revocation proceedings, payments to investment accounts at a securities brokerage firm, payments of medical expenses for Reich and Jossem, and purchases of luxury linens, among other things. (Compl.¶ 35a–f.) The Complaint specifically alleges that Reich and Jossem diverted funds that IDTS owed to Techno, leaving IDTS without assets and unable to pay its debts, including the arbitration awards and subsequent judgment in this Court. (Compl.¶¶ 36–38.) The Complaint further alleges that Jossem arranged for IDTS to pay her in excess of $1 million in consult-

ing fees, in addition to her compensation as a director. (Compl.¶ 93.) These alleged diversions and misappropriations of IDTS funds are alleged to have constituted a waste of corporate assets and a breach of the fiduciary duties that Reich and Jossem owed to IDTS as an officer and director, respectively. (Compl.¶¶ 81–86, 90–94.)

In February 1993, Reich and Jossem incorporated defendant M & B Oxford 41, Inc. ("M & B Oxford"), a New York corporation. (Compl.¶ 3a, 12, 41.) At that time, Jossem was the sole shareholder and president of M & B Oxford, as well as the Chairman of its Board of Directors. (Compl.¶ 10, 12, 41.) Reich and Jossem used M & B Oxford to hold ownership interests in four apartments, three of which were combined into one larger apartment, at 422 East 72nd Street in New York City. (Compl.¶ 3a.) The larger apartment at 422 East 72nd Street, which Reich and Jossem have occupied as their principal residence, is currently listed for sale for approximately $9 million. (Compl.¶ 3a, 12.) The Complaint alleges that Reich and Jossem dominated and controlled the actions of M & B Oxford, made all decisions on its behalf, and used that control over the corporation to further their own personal interests, principally by putting their principal residence beyond the reach of creditors. (Compl.¶ 42, 46, 47–48.)

On or about May 31, 1994, Jossem entered into a transaction with P & F Equities, in which Jossem conveyed to P & F Equities all of her stock in M & B Oxford, in exchange for her release from a personal guarantee that she had provided on behalf of M & B Oxford. (Compl.¶ 55.) P & F Equities was organized under the laws of the State of New York in December 1993, but it was dissolved by the New York Secretary of State on June 23, 1999, for failure to file or pay the corporate franchise taxes required by New York law.

(Compl.¶ 56.) Since the transfer of her shares in M & B Oxford to P & F Equities, Jossem has continued to serve as Chairman, President, or Chief Executive Officer of M & B Oxford. (Compl.¶ 12.) The Complaint alleges that the conveyance of the M & B Oxford shares was not supported by fair consideration and that it was entered into by the parties in bad faith, with the intent to place Jossem's valuable assets beyond the reach of creditors. (Compl.¶ 58, 61.)

In January 1993, Jossem purchased property located at 65 Red Dirt Road in Amagansett, New York, for $212,000. (Compl.¶ 64.) In October 1994, Jossem purchased property located at 57 Red Dirt Road, also in Amagansett, for $128,500. (Id.) In February 1995, Jossem purchased property located at 15 Red Dirt Road for $130,000. (Id.) All three properties were allegedly purchased using funds diverted from IDTS. (Compl.¶ 65.) In January 1998, Jossem sold all three properties to defendant Atrium Square, Inc. ("Atrium Square"), for $570,000. (Compl.¶¶ 3b, 66.) Atrium Square is a corporation organized and existing under the laws of the State of Delaware, and has its principal place of business in New York, New York. (Compl.¶ 14.) Atrium Square was incorporated on February 23, 1994, and it registered to do business in the State of New York on February 9, 1999. (Id.) Jossem is the President and Chief Executive of Atrium Square. (Compl.¶ 68.)

Atrium Square subsequently sold two of the Red Dirt Road properties for over $1.5 million, and still holds the third. (Compl.¶ 67.) The Complaint alleges that Jossem's sale of the Red Dirt Road properties to Atrium Square was not supported by fair consideration, and that the parties entered into the conveyance in bad faith and with intent to place Jossem's valuable assets beyond the reach of her creditors. (Compl.¶ 69, 72.)

The Complaint also alleges that Atrium Square is the alter ego of Jossem. (Compl.¶ 75.) As the President and Chief Executive Officer, Jossem is alleged to have conducted the activities of Atrium Square without observing required corporate formalities, and the Complaint alleges that Atrium Square engaged in the business of real estate in New York without first registering to do business in New York. (Compl.¶¶ 76–77.) The Complaint alleges that Jossem misused the corporate form of Atrium Square in order to place valuable assets beyond the reach of creditors. (Compl.¶ 78.)

### III.

### A.

The plaintiff's first claim for relief asserts that Reich and Jossem are liable as alter egos for the judgment entered against IDTS on July 29, 1997 in this Court. The defendants contend both that this claim is time-barred and that it fails to state a claim under New York law.

■ Because this Court is sitting in diversity, it applies the choice of law rules of New York, the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.1997); *Insurance Co. of N. Am. v. Pyramid Ins. Co. of Bermuda, Ltd.*, No. 92 Civ. 1816, 1994 WL 88701, at *2 (S.D.N.Y. Mar.16, 1994). The defendants argue that New York's borrowing statute, N.Y. C.P.L.R. § 202, applies. That statute provides:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

Under this statute, when a nonresident, such as the plaintiff Techno, sues based upon a cause of action that accrued outside of New York, "the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998); *Smith v. Soros*, No. 02 Civ. 4229, 2003 WL 22097990, at *4 (S.D.N.Y. Sept.5, 2003).

■ Ordinarily, for purposes of the borrowing statute, a cause of action in tort or contract accrues at the time and in the place of the injury. *See Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 693 N.Y.S.2d 479, 715 N.E.2d 482, 485–86 (1999). Additionally, "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Id.* at 485; *Soros*, 2003 WL 22097990, at *4.

■ The defendants argue that the plaintiff's injury is purely economic and therefore the cause of action accrued in Russia, where Techno is incorporated. The defendants further assert that the relevant Russian statute of limitations would be three years, running from the time the plaintiff knew or should have known about the violation of its right.[2] They argue that

**2.** The defendants have submitted a declaration from a proffered expert on Russian law, Paul B. Stephan III. Professor Stephan maintains that, were Russian law to control this dispute, all of the plaintiff's claims would be governed by the three-year statute of limitations provided by Article 196 of the Russian Civil Code. (Declaration of Paul B. Stephan III dated Dec. 10, 2003, ¶ 17.) He also states that he is aware of no tolling provisions that would apply. (*Id.* ¶ 18.) The defendants also

this statute of limitations rather than the longer twenty-year statute of limitations in New York, *see* N.Y. C.P.L.R. § 211(b), should be applied, and that under the Russian statute of limitations the plaintiff's first claim for relief is time-barred. However, the defendants have cited no case in which New York courts have applied N.Y. C.P.L.R. § 202 to an action by a nonresident to enforce a New York judgment. Nor is the Court aware of any such case.

There is evidence that New York courts would apply the borrowing statute to an action brought to enforce a foreign judgment, because an action on a foreign judgment accrues outside New York, namely where the foreign judgment is returned. *See Chesapeake Coal Co. v. Mengis,* 102 A.D. 15, 92 N.Y.S. 1003 (App.Div.1905); McLaughlin, Practice Commentaries, McKinney's Consol. Laws of N.Y., C.P.L.R. C211:3. However, there is support for the position that New York courts will disregard the statute of limitations of the state where a foreign judgment has been initially returned when that judgment has been registered in New York, because the judgment is then treated as if it were a New York judgment. *See Mee v. Sprague,* 144 Misc.2d 1057, 545 N.Y.S.2d 268 (1989) (holding that court would enforce New York default judgment entered based upon Oklahoma default judgment, even though Oklahoma statute of limitations on Oklahoma judgment had already run, although not discussing the borrowing statute).

It is not surprising that the defendants can point to no case in which New York courts have applied the borrowing statute to actions to enforce New York judgments. As the New York Court of Appeals has explained, "C.P.L.R. § 202 is designed to add clarity to the law and provide the certainty of uniform application to litigants." *Global Fin. Corp.,* 693 N.Y.S.2d 479, 715 N.E.2d at 485. The

goals of uniformity and clarity are better served when the cause of action in a judgment enforcement proceeding is considered to have accrued in the place of the judgment, rather than the residence of any of the prevailing litigants. Indeed, the Appellate Division has held that for purposes of the borrowing statute a cause of action on a foreign judgment accrues in the place where the judgment is entered, without considering the residence of the judgment creditor. *Chesapeake Coal,* 92 N.Y.S. at 1003–04. There is no reason that an action on a New York judgment should accrue in a place other than where it is entered, namely in New York. Moreover, a principal purpose of the borrowing statute is to prevent forum shopping by nonresidents seeking to enforce claims that arise outside New York. *Insurance Co. of N. Am.,* 112 F.3d at 72. The plaintiff in this case is not seeking to resuscitate a claim that has lapsed elsewhere; rather, it is seeking to execute on a New York judgment against assets that are currently located in New York. New York is the logical forum to which the plaintiff would resort.

The New York Court of Appeals has instructed that the legislature used the word "accrued" in the borrowing statute in the same sense it is used throughout N.Y. C.P.L.R. Article 2, namely, to describe "the time when, and the place where, the plaintiff first had the right to bring the cause of action." *Global Fin. Corp.,* 693 N.Y.S.2d 479, 715 N.E.2d at 484 (internal quotation marks and citation omitted). The right to sue on tort and contract claims arises at the moment of injury, and the statute therefore looks to the place where the right to sue arose. By contrast, the right to execute on a New York judgment arises when the judgment is entered, not when the defendant "injures" the

cite *Concern Sojuzvneshtrans v. Buyanovski,* 80 F.Supp.2d 273, 281 (D.N.J.1999).

plaintiff by refusing to pay the judgment. Similarly, the right to sue on a New York judgment accrues in New York irrespective of the residence of the judgment creditor. Therefore, the New York statute of limitations should apply to this action to the extent it is a judgment enforcement action.

The defendants argue further that even if the New York statute of limitations applies, the six-year statute of limitations governing the underlying breach of contract claim should apply, rather than the twenty-year statute of limitations in N.Y. C.P.L.R. § 211(b) that applies to judgment enforcement actions. This argument has previously been rejected by the Court of Appeals for the Second Circuit in *William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 142–43 (2d Cir.1991). In *Passalacqua*, the Court of Appeals affirmed the district court's holding that a judgment creditor's attempt to enforce a judgment against alleged alter egos of the judgment debtor is governed by the same twenty-year statute of limitations that would apply to an action brought against the judgment debtor itself. *Id.; William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 608 F.Supp. 1261, 1264 (S.D.N.Y.1985). The Court of Appeals observed that once alter ego status is established, "the previous judgment is then being enforced against entities who were, in essence, parties to the underlying dispute; the *alter egos* are treated as one entity." *Passalacqua*, 933 F.2d at 143; *see also Ammcon, Inc. v. Kemp*, 826 F.Supp. 639, 644 (E.D.N.Y. 1993); *Matter of Holborn Oil Trading Ltd. & Interpetrol Bermuda Ltd.*, 774 F.Supp. 840, 847 (S.D.N.Y.1991). The conclusion reached in *Passalacqua* has been adopted by New York state courts as well. *See Solow v. Domestic Stone Erectors, Inc.*, 229 A.D.2d 312, 645 N.Y.S.2d 17, 17 (App. Div.1996).

The defendants seek to avoid the holdings of *Passalacqua* and *Solow* by arguing that those holdings are no longer good law. They argue that the Supreme Court's decision in *Peacock v. Thomas*, 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), and the Second Circuit Court of Appeals' decision interpreting *Peacock* in *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100 (2d Cir.2001), have undermined the rationale on which the conclusion in *Passalacqua* was based. In *Peacock*, the Supreme Court held that federal courts do not possess ancillary jurisdiction "over new actions in which a federal judgment creditor seeks to impose liability for a money judgment on a person not otherwise liable for the judgment." *Peacock*, 516 U.S. at 351, 116 S.Ct. 862. In *Epperson*, the Court of Appeals found that a fraudulent conveyance action did fall within the district court's ancillary jurisdiction, despite the Supreme Court's holding in *Peacock*, because the action is one to enforce a judgment rather than to impose a new liability on a third party. *Epperson*, 242 F.3d at 104. However, the Court of Appeals noted that *Peacock* would apply to "proceedings, such as claims of alter ego liability and veil-piercing, that raise an independent controversy with a new party in an effort to shift liability." *Id.* at 106. Indeed, the Court of Appeals observed that veil-piercing judgment enforcement actions have long required an independent jurisdictional basis, at least since the Supreme Court's decision in *H.C. Cook Co. v. Beecher*, 217 U.S. 497, 30 S.Ct. 601, 54 L.Ed. 855 (1910). *Id.* at 105.

The defendants claim that the holdings in *Peacock* and *Epperson* make it clear that a veil-piercing or alter ego claim cannot be governed by the statute of limitations applicable to a judgment enforcement action. The argument is unpersuasive. Both *Peacock* and *Epperson* deal with a federal court's ancillary jurisdiction over a

judgment enforcement action, and thus have no bearing on the substantive or procedural elements of such an action under the applicable state law. The Court of Appeals in *Epperson* noted that in this Circuit "a distinction *for jurisdictional purposes* exists between an action to collect a judgment ... and an action to establish liability on the part of a third party." *Epperson,* 242 F.3d at 104 (emphasis added). That distinction thus does not affect the interpretation of New York statute of limitations law in *Passalacqua.* That an action is considered new and independent for purposes of federal jurisdiction does not require that it be considered in the same way for purposes of state substantive or procedural law. *See U.S.I. Properties v. M.D. Construction Co.,* 230 F.3d 489, 498 n. 8 (1st Cir.2000) ("State courts, as courts of general jurisdiction, are free to employ any enforcement mechanisms warranted by state law, even where those mechanisms allow liability to be established directly against a third party to the original action. However, the limited nature of federal jurisdiction in general confines the scope of enforcement jurisdiction as well. The incorporation of state enforcement procedures through Rule 69 is not alone sufficient to create *federal* jurisdiction over such enforcement proceedings. The fact that Rule 69(a) may (by way of state law) afford procedural mechanisms for enforcing an existing federal judgment against a third party not otherwise liable does not obviate the need to establish the jurisdiction of the federal court over the supplemental proceeding.") Where a federal court has independent grounds for jurisdiction, it can enforce a judgment us-ing any of the procedures afforded under state law. Fed.R.Civ.P. 69(a).

There is no reason to doubt that *Passalacqua* remains good law.[3] Indeed, its interpretation of New York law is binding on this Court. The plaintiff's alter ego claims are well within the applicable twenty-year statute of limitations of N.Y. C.P.L.R. § 211(b). To the extent that the defendants contend that the claims for relief based on alter ego liability-namely, the first, second, and seventh claims for relief-should be dismissed as time-barred, the motion is denied.

## B.

■ The defendants contend alternatively that, even if the plaintiff's first claim for relief is not time barred, it should be dismissed for failure to state a claim. In the first claim for relief, the plaintiff alleges that Reich and Jossem are liable for the judgment against IDTS because they are the alleged alter egos of IDTS. In general, New York courts will pierce the corporate veil "whenever necessary to prevent fraud or achieve equity." *Walkovszky v. Carlton,* 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6, 7 (1966) (internal quotation marks and citation omitted). No definitive rule governs when courts will pierce the corporate veil, because the decision "in a given instance will necessarily depend on the attendant facts and equities." *Morris v. New York State Dep't of Taxation and Fin.,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160 (1993). "Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination

---

**3.** Not surprisingly, even after *Peacock,* state appellate courts in other jurisdictions continue to cite *Passalacqua* as persuasive authority in determining that veil-piercing and alter ego actions by judgment creditors should be governed by the statute of limitations applicable to judgment enforcement actions. *See Norwood Group, Inc. v. Phillips,* 149 N.H. 722, 828 A.2d 300, 303 (2003); *Oceanics Schools, Inc. v. Barbour,* 112 S.W.3d 135, 145 (Tenn. Ct.App.2003).

of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *Id.* at 1160–61.

■ Courts will consider a lengthy list of factors when determining whether it is appropriate to pierce the corporate veil, including: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *Passalacqua,* 933 F.2d at 139.

■ The plaintiff has alleged a number of these factors that courts routinely consider when deciding whether to pierce the corporate veil. For example, the Complaint alleges that Reich and Jossem dominated and controlled IDTS, made all decisions on its behalf, and used their power over the corporation to further their own personal interests. (Compl.¶ 32.) The alleged domination and control is substantiated by factual allegations that Reich and Jossem misappropriated IDTS's funds and diverted those funds to their personal use. (Compl.¶¶ 34–36.) The plaintiffs allege that the defendants failed to observe required corporate formalities and that IDTS was undercapitalized. (Compl.¶¶ 29, 33.) The Complaint also alleges that the domination of IDTS exercised by Reich and Jossem resulted in injury to the plaintiff, because it left IDTS unable to pay its debts, including the arbitration judgment, and because Reich and Jossem have been able to hide valuable assets from creditors. (Compl.¶¶ 36–38.)

The defendants argue in response that the Complaint merely alleges that IDTS had one officer and one shareholder, as well as other trappings of closely-held corporations. They maintain that if the plaintiff's allegations are sufficient to state a claim, it would mean the end of limited liability for owners and operators of closely-held corporations. The argument simply ignores the substance of the allegations of abuse of the corporate form that have been alleged. More importantly, it imposes too high a burden on the plaintiff's pleading for the purposes of a motion to dismiss. The plaintiff has alleged facts that, when viewed in the light most favorable to it, could entitle the plaintiff to relief. *See Solow,* 645 N.Y.S.2d at 17 ("The complaint clearly indicates that plaintiff seeks to enforce a judgment it obtained against the first-named corporate defendant against the other two corporate defendants and the individual defendant on the theory that the individual used his domination and control over all three corporations to transfer assets of the debtor corporation to the other two corporations so as to make the firm incapable of honoring its obligations to plaintiff. These allegations are sufficient to warrant treating all four defendants as a single personality for purposes of enforcement of plaintiff's judgment."); *Dannasch v. Bifulco,* 184 A.D.2d 415, 585 N.Y.S.2d 360, 362 (App. Div.1992). The defendants' motion to dismiss the first claim for relief is therefore denied.

## C.

■ The defendants also move to dismiss the plaintiff's second and seventh claims for relief for failure to state a claim. Those claims allege, respectively, that M & B Oxford is the alter ego of Reich and Jossem and that Atrium Square is the alter ego of Jossem. These claims for relief seek to pierce the corporate veil in reverse, holding M & B Oxford and Atrium Square liable for the debts of Reich and Jossem. As with conventional veil-piercing claims, in a reverse veil-piercing claim, the plaintiff must allege (1) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (2) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *See Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997); *State v. Easton*, 169 Misc.2d 282, 647 N.Y.S.2d 904, 908–09 (N.Y.Sup. 1995).

■ The plaintiff has sufficiently alleged a claim for reverse veil piercing against M & B Oxford and Atrium Square. The Complaint, viewed in the light most favorable to the plaintiff, alleges that Reich and Jossem are at least the equitable owners of M & B Oxford and Atrium Square. (*See* Compl. ¶¶ 41–48, 65–69, 76–78.) The plaintiff has also alleged that Reich and Jossem exercised complete domination over the corporations. (Compl.¶¶ 42, 76.) And the plaintiff has alleged that the defendants exercised that complete domination to abuse the corporate form in a manner that resulted in injury to the plaintiff, namely by using assets for personal rather than corporate purposes and by placing assets beyond the reach of creditors. (Compl.¶¶ 48–49, 78–79.)

## D.

The plaintiff's third and fifth claims for relief are brought under New York's Debtor and Creditor Law § 273–a.[4] The plaintiff seeks to set aside two allegedly fraudulent conveyances by Jossem: first, the May 1994 transfer of her M & B Oxford stock to P & F Equities and, second, the January 1998 sale of the Red Dirt Road properties in Amagansett, New York, to Atrium Square. The defendants contend that these claims fail to state a claim upon which relief may be granted, and that, in any event, they are barred by the applicable Russian statute of limitations.

■ To state a claim under § 273–a, the plaintiff must establish: (1) that the conveyance was made without fair consideration; (2) that the conveyor is a defendant in an action for monetary damages, or that a judgment has been docketed against the conveyor; and (3) that the defendant failed to satisfy the judgment. *Petersen v. Vallenzano*, 849 F.Supp. 228, 230 (S.D.N.Y.1994).

■ The defendants assert that the plaintiff has failed to state a claim because Jossem was not a judgment debtor or a defendant in an action for money damages at the time the allegedly fraudulent conveyances were made. In May 1994, at the time of the transfer of the M & B Oxford stock, IDTS was a defendant in the arbitrations, and an arbitration for money damages is an "action for money damages" within the meaning of N.Y. D.C.L. § 273–a. *See Dixie Yarns, Inc. v. Forman*, 906 F.Supp. 929, 935–36 (S.D.N.Y.1995). At the time of the January 1998 sale of the

4. Section 273–a of N.Y. C.P.L.R. provides:
Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

Red Dirt Road properties, IDTS was already a judgment debtor in this Court. While Jossem was not a party to the arbitrations and was not herself a judgment debtor at the time of the transfers, if Jossem is adjudged to be the alter ego of IDTS, then she would stand in the shoes of IDTS for purposes of the statute. She would be considered to have been a defendant in the arbitrations and subsequently to be a judgment debtor at the same time that IDTS was a defendant and judgment debtor. *See Eckhaus v. Blauner*, No. 94 Civ. 5635, 1997 WL 362166, at *7–*9 (S.D.N.Y. June 26, 1997); *Petersen*, 849 F.Supp. at 232–33 ("Due to that determination [of defendant Vallenzano's alter ego status], Vallenzano has become the judgment debtor of Petersen as of the date of the original judgment, in this case, December 14, 1987. Accordingly, any transfers of Vallenzano's property and assets after that date without adequate consideration would be subject to the parameters of New York Debtor and Creditor Law § 273–a."). This conclusion is consistent with the Second Circuit Court of Appeals' comment, in the context of the statute of limitations for judgment enforcement actions, that alter egos are "in essence, parties to the underlying dispute; the *alter egos* are treated as one entity." *Passalacqua*, 933 F.2d at 143. Therefore, the plaintiff has sufficiently alleged the elements of a violation of N.Y. D.C.L. § 273–a, which, in this case, will depend upon proof that Jossem was in fact an alter ego of IDTS and thereby a defendant in the arbitrations or a judgment debtor at the time of the disputed conveyances.

The defendants separately contend that any properly stated claim under D.C.L. § 273–a would be time-barred. As explained above, because this Court is sitting in diversity, it applies the choice of law rules of New York, the forum state. *See Lazard Freres*, 108 F.3d at 1539. The defendants argue that New York's borrowing statute, N.Y. C.P.L.R. § 202, applies to the fraudulent conveyance claims brought under § 273–a. As explained above, under N.Y. C.P.L.R. § 202, when a nonresident sues based upon a cause of action that accrued outside of New York, "the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir.1998).

The New York statute of limitations for a claim brought pursuant to D.C.L. § 273–a is six years. N.Y. C.P.L.R. § 213; *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993). The plaintiff's D.C.L. § 273–a claims did not accrue, and the six-year statute of limitations did not begin to run, until July 29, 1997, the date that the plaintiff obtained a judgment against IDTS. *See Grace v. Rosenstock*, 228 F.3d 40, 54 (2d Cir.2000); *Carey v. Crescenzi*, 923 F.2d 18, 20–21 (2d Cir. 1991). Because this lawsuit was filed on July 28, 2003, barely less than six years after the claims accrued, the D.C.L. § 273–a claims would be timely under the New York statute of limitations.

The parties do not agree on the applicable statute of limitations under Russian law. The defendants contend, based on a declaration submitted by their expert on Russian law, that the applicable statute of limitations for all of the plaintiff's claims, including those under § 273–a, is the three-year period of limitations provided by Article 196 of the Russian Civil Code, and that they are unaware of any reason why that three-year period would be tolled under Russian law for any of the plaintiff's claims.[5] (Decl. of Paul B. Stephan III

---

**5.** However, in their initial papers on the mo tion to dismiss, the defendants maintained

¶¶ 16–18.) By contrast, the plaintiff contends, based on a declaration submitted by its own expert on Russian law, that the fraudulent conveyance claims under § 273–a, which challenge conveyances that occurred in 1994 and 1998, would likely be governed by the ten-year statute of limitations provided by Article 181 of the Russian Civil Code that is applicable to "mock transactions." (Decl. of Tamara Evgenievna Abova ¶ 9 n. 3; ¶¶ 22–26.) The plaintiff contends that a widely recognized example of a "mock transaction" under Russian law is the transfer of assets from a company to a closely-related third party in order to retain control over the transferred assets and yet shield them from creditors. (*Id.* ¶ 25.) Moreover, the plaintiff contends that even if the three-year statute of limitations in Article 196 applies, the statute would be tolled pursuant to Article 200(1) of the Civil Code until the time when the plaintiff knew or should have known of the violation of its right. (*Id.* ¶ 10.) The plaintiff contends that under either of these applications of Russian law, its claims brought pursuant to § 273–a would be timely.

 The parties do not dispute that the plaintiff, as a Russian corporation, is a nonresident of New York. Therefore, the applicability of N.Y. C.P.L.R. § 202 depends upon whether the plaintiff's fraudulent conveyance claims under D.C.L. § 273–a accrued outside New York. The plaintiff contends that the cause of action accrued in New York, because its claim under D.C.L. § 273–a did not arise until entry of judgment against IDTS, and because that judgment was entered in New York. The entry of a judgment, while determinative of *when* a cause of action under § 273–a accrues, is not determinative

of *where* the cause of action accrues. For example, it is clear that while a claim for breach of contract cannot accrue until the contract is breached, for purposes of the borrowing statute, the claim "accrues" in the place where the plaintiff sustains the economic injury, which is not necessarily the same as the place where the contract is breached. *See Global Fin. Corp.,* 693 N.Y.S.2d 479, 715 N.E.2d at 485.

A cause of action under § 273–a is a claim for constructive fraud. *See Orr,* 991 F.2d at 35. And it is well settled that, for the purposes of the borrowing statute, the cause of action for a tort claim accrues in the place of the injury. *Global Fin. Corp.,* 693 N.Y.S.2d 479, 715 N.E.2d at 484–85; *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* No. 93 Civ. 6876, 2001 WL 492363, at *2 (S.D.N.Y. May 9, 2001). Additionally, "when an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Fin. Corp.,* 693 N.Y.S.2d 479, 715 N.E.2d at 485. The borrowing statute has been found to apply when nonresident judgment creditors have brought fraudulent conveyance actions under other sections of the C.P.L.R and D.C.L. *See GFL Advantage Fund, Ltd. v. Colkitt,* No. 03 Civ. 1256, 2003 WL 21459716, at *2 (S.D.N.Y. June 24, 2003) (applying borrowing statute to claims brought under N.Y. C.P.L.R. §§ 5225, 5227, and 5239, although application was not dispositive); *Williams v. Infra Commerc Anstalt,* 131 F.Supp.2d 451, 455 (S.D.N.Y.2001) (applying borrowing statute to claims brought pursuant to N.Y. D.C.L. §§ 273 (conveyance by insolvent) and 276 (conveyance made with intent to defraud)). For purposes of the borrowing statute, there is no reason to

---

that, pursuant to Article 181(2) of the Russian Civil Code, the statute of limitations for a claim based on an allegedly fraudulent transaction would be one year from the time the

plaintiff knew or should have known about the fraud. (Defs.' Mem. in Support of Mot. to Dismiss at 5 n. 3.)

treat fraudulent conveyance claims brought under § 273–a differently than other fraudulent conveyance actions, to which the borrowing statute applies and which have been determined to have accrued where the plaintiff resides and incurred the economic injury.

In this case, the injury sustained by the plaintiff as a result of the alleged fraudulent conveyance was purely economic. Therefore, its cause of action is deemed to have accrued where the plaintiff resides and where it sustained the economic impact of the loss, namely, Russia. However, as explained above, the applicable statute of limitations under Russian law is in dispute. The record before the Court at this time is insufficient for the Court to conclude as a matter of law that the plaintiff's claims under § 273–a are time-barred under Russian law. The issue could turn, for example, on the question of fact concerning when the plaintiff knew or should have known about the challenged conveyances, and whether, under the facts of this case, any tolling provision applies. Therefore, the defendants' motion to dismiss the plaintiff's third and fifth claims for relief is denied without prejudice.

### E.

The plaintiff's fourth and sixth claims for relief are for attorney's fees pursuant to D.C.L. § 276–a. Attorneys' fees can be obtained under that statute only where it can be proved that the conveyance was "made by the debtor and received by the transferee with actual intent ... to hinder, delay or defraud either present or future creditors...." The plaintiff relies on the same conveyances that form the basis for the third and fifth claims for relief. For the reasons explained above with respect to the third and fifth claims for relief, there is no basis to conclude that the plaintiff has failed to state a claim under the fourth and sixth claims for relief or that those claims are time-barred. The fourth and sixth claims for relief therefore cannot be dismissed at this time, and the motion to dismiss is denied without prejudice because the effect of the Russian statute of limitations cannot be decided as a matter of law on this record.

### F.

■ The plaintiff's eighth and ninth claims for relief are brought under New York's Business Corporation Law § 720, which provides for actions against corporate officers and directors for misconduct.[6] The eighth claim for relief alleges that Reich, as president of IDTS, breached her fiduciary duties to IDTS by improperly diverting, misappropriating, and wasting corporate assets. In particular, the plaintiff alleges that Reich diverted at least $15 million to herself and her children, including Jossem, and that she authorized pay-

---

6. Section 720 provides in relevant part:

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

(1) Subject to any provision of the certificate of incorporation authorized pursuant to paragraph (b) of section 402, to compel the defendant to account for his official conduct in the following cases:

(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

(2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

. . . . .

(b) An action may be brought for the relief provided in this section ... by a corporation, or a receiver, trustee in bankruptcy, officer, director or judgment creditor thereof....

ment of consulting fees to Jossem that were unjustified and a waste of IDTS's assets. The plaintiff's ninth claim for relief asserts the same claims against Jossem, as the sole director of IDTS. The plaintiff seeks an accounting and to set aside any unlawful conveyances by Reich and Jossem. However, these claims under B.C.L. § 720 are barred by the New York statute of limitations.[7]

■ Under New York law, a judgment creditor may assert a § 720 claim derivatively on behalf of the corporation, the judgment debtor. *See* B.C.L. § 720(b). In that case, the statute of limitations begins to run when the cause of action accrues to the corporation—that is, at the time of the alleged wrongdoing. *See Hastings v. H.M. Byllesby & Co.*, 293 N.Y. 404, 57 N.E.2d 733, 736 (1944).

■ A judgment creditor may also sue directly on a claim under § 720. Such a cause of action does not accrue, and the statute of limitations does not begin to run, until a judgment has been obtained and execution returned unsatisfied. *See Buttles v. Smith*, 281 N.Y. 226, 22 N.E.2d 350, 353 (1939) (construing General Corporation Law §§ 60 and 61, the predecessor statutes to B.C.L. § 720). New York law allows both direct and derivative suits under § 720 because the wrong asserted by a judgment creditor is "the illegal transfer of corporate assets which otherwise would have been available for the satisfaction of a judgment obtained by the creditor," which is "independent and distinct from any wrong to the corporate debtor." *Hastings*, 57 N.E.2d at 735.

■ Direct and derivative claims under § 720 are governed by different statutes of limitations. When a judgment creditor sues directly on a claim of officer or director misconduct, it is "an action to recover upon a liability imposed by statute," subject to the three-year statute of limitations of N.Y. C.P.L.R. § 214(2), which runs from the date that the plaintiff became a judgment creditor. *See Atlanta Shipping Corp. v. Chemical Bank*, 631 F.Supp. 335, 350 (S.D.N.Y.1986) (assuming, for purposes of motion to dismiss, that N.Y. C.P.L.R. § 214(2) applies to judgment creditor's direct claim brought pursuant to B.C.L. § 720); *Luke v. Polstein*, 268 A.D. 921, 51 N.Y.S.2d 427, 428 (App. Div.1944) (noting that judgment creditors' claims, brought pursuant to General Corporation Law §§ 60, 61, and 70, against directors of debtor corporation for waste were "actions at law and they came into being in favor of judgment creditors perforce the statute"), *aff'd mem.*, 294 N.Y. 896, 63 N.E.2d 27 (1945). By contrast, when a judgment creditor sues derivatively on a claim under B.C.L. § 720, it is "an action by or on behalf of a corporation," subject to the six-year statute of limitations of N.Y. C.P.L.R. § 213(7). *See Rupert v. Tigue*, 259 A.D.2d 946, 687 N.Y.S.2d 502, 503 (App.Div.1999).

In this case, the alleged misconduct by Reich and Jossem as officer and director of IDTS, which serves as the basis of the claims under B.C.L. § 720, occurred between 1991 and 1994. The plaintiff became a judgment creditor of IDTS on July 29, 1997. The present action was filed on July 28, 2003. Therefore, the plaintiff's direct and derivative claims are both time barred, because this action was brought more than three years after the unsatisfied judgment that caused the plaintiff's direct

---

7. The defendants assert that New York courts would apply the borrowing statute, N.Y. C.P.L.R. § 202, to these claims and that the three-year Russian statute of limitations should govern as the shortest of the applica-

ble statutes. Because the claims are independently barred under the New York statute of limitations, there is no reason to apply the borrowing statute.

claim to accrue, and more than six years after the alleged wrongful conduct that caused IDTS's claim to accrue against Reich and Jossem.

The plaintiff contends that the six-year statute of limitations provided by C.P.L.R. § 213(7) should not have started running until July 29, 1997, when Techno's claims as a judgment creditor accrued. The plaintiff relies on *Rupert* to support this contention; however, *Rupert* treats the six-year statute of limitations as running from the "alleged wrongful conduct by defendant." *Rupert*, 687 N.Y.S.2d at 503 (noting that judgment creditor's action was one on behalf of debtor corporation). Moreover, the six-year statute of limitations provided in § 213(7) expressly applies to claims "by or on behalf of a corporation." The claims that IDTS might have against Reich and Jossem accrued, based on the allegations in the Complaint, no later than 1994. Techno, as the judgment creditor of IDTS, may assert those claims on behalf of IDTS pursuant to B.C.L. § 720. In doing so, Techno stands in the shoes of the judgment debtor IDTS, and thus should not have more rights than IDTS would have in asserting those claims. If, as the plaintiff argues, the statute of limitations did not begin to run on its § 720 claims until it obtained a judgment, Techno would then have greater rights than IDTS in asserting those claims, because for IDTS the statute of limitations began to run at the time the claims accrued, which in this case was no later than 1994. The operation of the statute of limitations works no hardship on a judgment creditor such as the plaintiff because even though the six-year statute of limitations on the derivative claims runs from the date of the misconduct, and the judgment creditor may have little or no time to bring such a claim after it becomes a judgment creditor, it has a fresh three-year statute of limitations from the date it becomes a judgment creditor to bring such claims directly. The plaintiff waited substantially more than three years after becoming a judgment creditor to attempt to bring such direct claims, and they are now time-barred. The plaintiff's claims under B.C.L. § 720 are not timely and, therefore, must be dismissed.

## IV.

In the event that their motion to dismiss was not granted in full, some of the defendants also move to stay this proceeding and to compel arbitration of all claims. Defendants Reich and Jossem seek, as admitted non-signatories, to invoke either of two arbitration agreements entered into by IDTS and Techno. The defendants first contend that the plaintiff's claims against Reich and Jossem arise out of and relate to the Agency Agreement that IDTS entered into with Techno as well as two other companies, and which provided that IDTS would serve as a sales agent for Techno in the sale of metals. (*See* Agency Agreement attached as Ex. B to Defendants' Combined Appendix, at 10.) The Agency Agreement contains an arbitration clause requiring arbitration of disputes in Sweden, governed by Swedish law.[8]

Alternatively, the defendants claim that the plaintiff's claims arise out of and relate

---

**8.** The arbitration clause in the Agency Agreement provides in pertinent part:

> Any controversy or claim arising out of or relating to this Agreement ... shall be settled by arbitration ... in Stockholm, Sweden, and shall be governed by the Swedish Arbitration Act of 1929, as amended and in force on 1.01.1984, and by Swedish law. The proceedings shall be held in English.
>
> If the validity of the arbitration clause or the jurisdiction of the Arbitration Court is contested by one or the other party, the Arbitration Court shall be competent to make a final decision concerning the said issues.

to the individual contracts between IDTS and Techno governing particular shipments of metals between July 1991 and July 1992, which provide for arbitration in Russia.[9] (See, e.g., Contract No. 21409300, dated July 14, 1992, attached as Ex. C to Defendants' Combined Appendix, at 10.) These contracts provided the original basis for the arbitration proceeding in Russia between IDTS and Techno. It was for breach of these contracts that the arbitration award was granted in favor of Techno. The defendants' argument that the arbitration clause in these contracts governs the plaintiff's claims in this action must be rejected, because the arbitration clause limits its applicability to disputes, differences or questions in connection with the "performance" of the contracts. (*Id.*) The plaintiff's claims are in no way connected to or related to the performance of the shipment contracts; any such claims are now res judicata following the arbitration awards, and it is the judgment on those claims that the plaintiff now seeks to execute.

The defendants argue, however, that the plaintiff's claims in this action arise out of the contractual relationships between IDTS and Techno memorialized in the Agency Agreement. The defendants contend that the plaintiff should not be permitted to avoid the contractual agreement to arbitrate all claims relating to those contractual relationships.

■■■ The defendants' application to stay is governed by the Federal Arbitration Act, which provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see also In re Home Ins. Co.,* 908 F.Supp. 180, 183 (S.D.N.Y.1995). Whether an agreement to arbitrate governs a particular dispute is essentially a matter of contract interpretation. *See Collins & Aikman Products Co. v. Building Sys., Inc.,* 58 F.3d 16, 19 (2d Cir.1995) ("Federal arbitration policy respects arbitration agreements as contracts that are enforceable in the same way as any other contract."); *see also Home Ins. Co.,* 908 F.Supp. at 183. Any doubts about the scope of arbitrable issues should be resolved in favor or arbitration. *Collins,* 58 F.3d at 19 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *see also United States Fire Ins. Co. v. Nat'l Gypsum Co.,* 101 F.3d 813, 816 (2d Cir.1996).

■■■ Unless the parties have clearly agreed otherwise, this Court, rather than an arbitrator, determines whether the parties did in fact agree to arbitrate a dispute. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir.1996). In *First Options,* the Supreme Court held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so," further noting that the traditional presumption in favor of arbitration when determining whether a particular dispute is arbitrable is reversed when determining who should decide arbitrability. *First Options,* 514 U.S. at 944–

---

**9.** The arbitration clause in the individual shipment contracts provides in pertinent part:

Any dispute, difference or question arising between the parties or their representatives in connection with performance of this contract which cannot be settled by mutual discussions shall be settled by way of Arbitration.

Such dispute shall be referred to the Arbitration Court of the RF Chamber of Commerce and Industry, Moscow in accordance with the rules of the said court.

The award of such Arbitration shall be considered final and binding upon both parties concerned.

45, 115 S.Ct. 1920 (citations and alterations omitted).

The defendants contend that the parties agreed to submit any questions of the arbitrability of disputes to the arbitrator. In support of this contention, the defendants cite the following sentence from the arbitration provision in the Agency Agreement: "If the validity of the arbitration clause or the jurisdiction of the Arbitration Court is contested by one or the other party, the Arbitration Court shall be competent to make a final decision concerning the said issues." That sentence states the parties' agreement that the Arbitration Court would be one among, presumably, many competent bodies that could determine the arbitrability of a particular dispute. It does not state that the Arbitration Court will have exclusive, or even primary, authority to determine arbitrability. Such a reading, urged by the defendants, would require omitting the words "be competent to" from the sentence.

There is no clear and unmistakable evidence that the parties agreed to arbitrate the issue of arbitrability. Indeed, the plain meaning of the arbitration clause is that the arbitration panel could determine arbitrability, not that it must determine that issue. Therefore, the Court will decide whether the current dispute between the parties is arbitrable under the Agency Agreement.

▪ The arbitration clause in the Agency Agreement is a classic "broad" arbitration clause, because it applies to "[a]ny controversy or claim arising out of or relating to" the Agreement. *See, e.g., Mehler v. Terminix Int'l Co. L.P.,* 205 F.3d 44, 49 (2d Cir.2000). The precise issue, therefore, is whether the parties agreed in this broad arbitration clause to arbitrate any alter ego actions brought as part of an effort to enforce a judgment confirming an arbitration award resulting from the arbitration process laid out in the

individual shipment contracts. As discussed above, the defendants' argument that, after *Peacock* and *Epperson,* the plaintiff's action cannot be construed as a judgment enforcement proceeding is unpersuasive. The action surely requires an independent jurisdictional basis in federal court, but the plaintiff's claims are part of an ongoing effort to enforce a judgment confirming two arbitration awards based on IDTS's breach of the individual shipment contracts. The plaintiff's claims that arose out of and related to the contracts between the parties, whether the individual shipment contracts or the Agency Agreement, have been decided. The defendants have provided no evidence of an agreement between the parties that they have agreed to submit judgment enforcement disputes to arbitration. Moreover, the cases upon which the defendants rely in asserting that alter ego and fraudulent conveyance claims are subject to arbitration are inapposite, because they do not deal with these claims in the context of judgment enforcement proceedings. *See Builders Fed. (Hong Kong) Ltd. v. Turner Constr.,* 655 F.Supp. 1400, 1406 (S.D.N.Y. 1987); *Prograph Int'l, Inc. v. Barhydt,* 928 F.Supp. 983, 990 (N.D.Cal.1996).

In *Menorah Ins. Co. v. INX Reinsurance Corp.,* 72 F.3d 218 (1st Cir.1995), the First Circuit Court of Appeals rejected arguments similar to those presented by the defendants. In *Menorah,* the plaintiff had obtained a default judgment against the defendant in an Israeli court after the defendant failed to appear to arbitrate the claims asserted against it. The plaintiff then sought to enforce the default judgment in a Puerto Rican court. The defendant removed the action to the United States District Court for Puerto Rico, asserting a claim that the underlying dispute had to be arbitrated. The defendant also counterclaimed, asserting that the judgment enforcement proceeding itself was

subject to arbitration. *See id.* at 220. The district court remanded the case, finding that the defendant had waived arbitration and that the judgment enforcement claims were not subject to arbitration.

On appeal, the defendant argued that the question of arbitrability should have been decided in the first instance by the arbitrator. Applying the standard established by the Supreme Court in *First Options,* the Court of Appeals determined that there was nothing in the agreement between the parties "clearly stating that the question of arbitrability of judgments should be decided by an arbitrator." *Id.* at 222. The Court of Appeals also agreed with the district court that the parties had not agreed to arbitrate the judgment enforcement dispute, noting that strong policy reasons advocate against finding such disputes arbitrable:

> Arbitration clauses were not meant to be another weapon in the arsenal for imposing delay and costs in the dispute resolution process. Underlying the policy of enforcing contracts to arbitrate is a belief that where parties can agree to a mutually optimal method and forum for dispute resolution, it serves the interests of efficiency and economy to allow them to do so.... In the context of international contracts, the opportunities for increasing the cost, time and complexity of resolving disputes are magnified by the presence of multiple possible fora, each with its own different substantive rules, procedural schematas, and legal cultures.... Neither efficiency nor economy are served by adopting [the defendant's] arguments. The scenario here-in which a party knowingly opts out of the arbitration for which it has contracted ..., sits on its hands while a default judgment is entered against it after service, refuses to pay, requires an enforcement action to be filed against it, and only then cries 'arbitration'-undermines both the certainty and predictability which arbitration agreements are meant to foster.

*Id.* at 222–23 (citations omitted).

The same considerations apply with equal weight here. Techno has a judgment against IDTS, and it seeks to enforce that judgment in part by imposing liability on the alleged alter egos of IDTS. The final awards in favor of Techno were rendered by the Arbitration Court in Moscow in March 1996. *AAOT,* 139 F.3d at 981. The judgment enforcing those awards was entered in this Court in July 1997 and affirmed on appeal in 1998. The judgment has been unsatisfied, and there is no evidence that any of the defendants sought to submit any of these disputes to arbitration in Sweden throughout the course of the litigation in this Court. It is only when it appears that the judgment creditor may be at the door that the defendants attempt to flee to arbitration in Sweden. The defendants merely hope to forestall the resolution of these judgment enforcement claims by submitting them first to arbitration in Sweden. The defendants' motion to stay the proceedings and to compel arbitration is denied.

## V.

The plaintiff seeks a preliminary injunction that would enjoin the defendants from transferring or otherwise disposing of certain assets that could allegedly be used to satisfy the judgment.

■ "[A] party seeking a preliminary injunction must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Federal Express Corp. v. Federal Espresso, Inc.,* 201

F.3d 168, 173 (2d Cir.2000). The defendants contend that the plaintiff has not shown irreparable harm, and that, in any event, even if the plaintiff did meet the standards required to obtain a preliminary injunction, the Court does not have the power grant the relief requested. The Court makes the following findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a).

■■■ The defendants are correct that this Court's equitable power to issue a preliminary injunction to prevent a defendant from transferring assets does not extend to an action for money damages where the plaintiff claims no lien or equitable interest in the assets sought to be enjoined. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). In *Grupo Mexicano,* the Supreme Court held that a district court had no power to issue a preliminary injunction to prevent the defendant from transferring or dissipating its only significant asset, which the plaintiffs hoped to use to satisfy an anticipated money judgment against the defendant. *See id.* at 311–13, 333, 119 S.Ct. 1961. The Supreme Court reaffirmed that the general equitable powers of federal courts include the authority to issue preliminary injunctions where the intermediate relief sought is of the same character as that which may finally be granted. *See id.* at 326, 119 S.Ct. 1961. The Court thus distinguished its holding in *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), that a preliminary injunction was appropriate where the principal objects of the plaintiffs' suit were rescission and restitution and where the preliminary injunction would be in aid of the equitable relief sought. *See id.* at 324–25, 119 S.Ct. 1961. The Court stated, "*Deckert* is not on point here because, as the Court took pains to explain, 'the bill state[d] a cause [of action] for equitable relief,' " *id.* at 325, 119 S.Ct. 1961 (quoting, with alterations, *Deckert,* 311 U.S at 288, 61 S.Ct. 229), but "[t]he preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt." *Id.* The Court noted that "before judgment (or its equivalent) an unsecured creditor has no rights at law or in equity in the property of his debtor," and that "[t]he requirement that the creditor obtain a prior judgment is a fundamental protection in debtor-creditor law-rendered all the more important in our federal system by the debtor's right to a jury trial on the legal claim." *Id.* at 330, 119 S.Ct. 1961.

The plaintiff here, like the plaintiffs in *Grupo Mexicano,* brings an action at law primarily for a money judgment against the defendants. In *Passalacqua,* the Court of Appeals rejected the argument that an alter ego action brought to enforce a judgment was entirely equitable in nature. The court held that a defendant in such an action had a right to a jury trial because the cause of action was legal:

Plaintiffs here seek enforcement of a money judgment obtained against Developers. The fact that plaintiffs seek money indicates a legal action. Defendants contend that because plaintiffs have already secured a money judgment against Developers, their claim for money is merely incidental to their equitable piercing claim and, like disgorgement, does not require a jury trial. We disagree. As just discussed, the action for piercing the corporate veil does not sound solely in equity. Further, while it is true that the right to a jury trial depends on the nature of the relief sought, not on what may ultimately be secured, the nature of the relief sought in the instant case is relief typically achieved in an action at law. Plaintiffs

seek to establish defendants' liability for the judgment already obtained against Developers.

*Passalacqua,* 933 F.2d at 136 (internal quotation marks and citations omitted). The alter ego action brought by the plaintiff in this case, like that brought in *Passalacqua,* seeks a money judgment against the defendants by imposing liability on them, as alter egos, for the judgment previously obtained against IDTS. The ultimate relief the plaintiff seeks is legal, not equitable, in nature.

Because the plaintiff's action is one for money damages, and because the plaintiff asserts no lien or equitable interest in the assets it seeks to restrain, this Court lacks the power to grant the preliminary injunction it seeks. The plaintiff's argument that *Grupo Mexicano* is inapplicable here because its action is primarily equitable in nature is unpersuasive. The alter ego action, as the Court of Appeals held in *Passalacqua,* is an action for money damages, even though it is brought as part of an action to enforce a judgment. The equitable relief that the plaintiff seeks, including the setting aside of alleged fraudulent conveyances, is incidental to, and indeed contingent upon the success of, the plaintiff's alter ego action. Before the plaintiff can seek equitable relief in enforcing the prior judgment, it must prove the legal liability of Reich and Jossem as alter egos. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (finding injunction issued against alleged alter ego of judgment debtor improper where alter ego status had not yet been litigated). Thus, the final

relief that the plaintiff seeks is the imposition of legal liability on Reich and Jossem for the money judgment against IDTS; the equitable relief the plaintiff seeks is designed to effectuate the collection of money in satisfaction of that alleged legal liability. A preliminary injunction in this case would be issued in aid of the collection of a money judgment, not final equitable relief, an outcome barred by *Grupo Mexicano.*[10]

Even if *Grupo Mexicano* did not prevent the Court from issuing a preliminary injunction in this case, the Court would deny the plaintiff's request because it has failed to establish a likelihood of irreparable harm in the absence of a preliminary injunction. "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (citations and internal quotation marks omitted). The plaintiff must establish " 'an injury that is neither remote nor speculative, but actual and imminent.' " *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989) (quoting *Consol. Consolidated Brands, Inc. v. Mondi,* 638 F.Supp. 152, 155 (E.D.N.Y.1986)). Furthermore, "[i]rreparable harm is 'injury for which a monetary award cannot be adequate compensation.' " *Int'l Dairy Foods Assoc. v. Amestoy,* 92 F.3d 67, 71 (2d Cir.1996) (quoting *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

10. The plaintiff's reliance on *United States ex rel. Rahman v. Oncology Assocs., P.C.,* 198 F.3d 489 (4th Cir.1999) is misplaced. In *Rahman,* the Court of Appeals for the Fourth Circuit held that *Grupo Mexicano* did not bar an injunction that froze assets in furtherance of the final equitable relief, including a constructive trust, sought in the complaint, even though the case also involved a claim for money damages. In this case, the relief requested by the plaintiff is more like the money damages claim addressed in *Grupo Mexicano,* because any equitable relief that the plaintiff might be entitled to is contingent upon its success on that claim.

As mentioned above, the plaintiff's suit is essentially one for money damages. Ordinarily, "[i]rreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). When a plaintiff fears that a defendant's actions might frustrate an anticipated money judgment, its remedies lie in the state prejudgment remedies available through Federal Rule of Civil Procedure 64, not a preliminary injunction.[11]

■■■ The circumstances in this case particularly undermine the plaintiff's allegations of irreparable injury. The plaintiff has specifically identified certain real estate holdings that it is concerned might be transferred. But the papers before the Court indicate that the defendants are subject to continuing scrutiny in the course of discovery in this case. The real estate, which has been identified in the New York area, will not disappear and the proceeds of any sale will be subject to scrutiny. Reich and Jossem are present in this jurisdiction, and there is no suggestion that they would flee or would not be subject to the continuing orders of the Court.

Moreover, the plaintiff's six-year delay in filing the complaint in this action, as well as the six-week delay between filing the complaint and seeking the preliminary injunction, argues against a finding of irreparable harm. The Court of Appeals has observed that "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.... Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985); *see also Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 35 (2d Cir.1991) (finding that surety's delay in asserting rights of *quia timet* and exoneration belied its claims of irreparable harm and thus would not support preliminary injunction); *Costello v. McEnery*, 767 F.Supp. 72, 78 (S.D.N.Y.1991) (finding that plaintiff's delay in seeking injunction to protect first amendment rights supported conclusion of insufficient showing of irreparable harm); *R.R.P.B.A. of State of New York, Inc. v. Metro–North Commuter R.R.*, 699 F.Supp. 40, 43 (S.D.N.Y.1988) (denying preliminary injunction and concluding that "plaintiff's delay in commencing this lawsuit [concerning alleged breach of collective bargaining agreement] suggests its own doubts as to the severity of harm at hand"). The plaintiff's motion for a preliminary injunction would thus have to be denied in any event because it has failed to establish that it would likely suffer irreparable harm if the injunction did not issue.

In short, the Court lacks the power to issue a preliminary injunction in this case, where the plaintiff seeks a money judgment and where the plaintiff claims no lien or equitable interest in the assets sought to be restrained. If the Court had the power, based on the plaintiff's showing, the

---

**11.** As the Supreme Court observed in *Grupo Mexicano*, the granting of a preliminary injunction in an action for money damages "could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?" *Grupo Mexicano*, 527 U.S. at 330–31, 119 S.Ct. 1961.

Court would not exercise its discretion to grant such an injunction, because the plaintiff has failed to show a likelihood of irreparable injury. Therefore, the plaintiff's motion for a preliminary injunction is denied.

## VI.

The defendants have also requested the Court to vacate or modify the restraining notices issued by the plaintiff's counsel pursuant to N.Y. C.P.L.R. § 5222, and to limit further issuance of such notices. The plaintiff's counsel has issued a total of twenty two restraining notices, two on Reich and Jossem and twenty others on entities that the plaintiff believes hold assets of IDTS, Reich, or Jossem. Some of the notices also purport to restrain all of the assets of M & B Oxford and Atrium Square as the alleged alter egos of Reich and Jossem.

Section 5222(a) provides that an attorney for the judgment creditor, as an officer of the court, may issue restraining notices "upon any person," except the employer of a judgment debtor or obligor where the property sought to be restrained consists of the judgment debtor's wages or salary. Section 5222(b) provides in pertinent part:

> A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest,

or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs . . . .

 Restraining notices issued pursuant to § 5222 are effective against assets in which the judgment debtor has an "interest," and they "only reach property and debts with such a connection to the judgment debtor." *AG Worldwide v. Red Cube Mgmt. AG*, No. 01 Civ. 1228, 2002 WL 417251, at \*8 (S.D.N.Y. Mar. 15, 2002). Thus, if third parties "do not have property or debts in which the judgment debtor has an interest, the restraining notices are not effective." *Id.* The "[j]udgment debtor's 'interest' in property must be understood to mean a direct interest in the property itself which, while it may require a court determination, is leviable and not an indirect interest in the proceeds of the

property...." *Sumitomo Shoji New York, Inc. v. Chemical Bank New York Trust Co.*, 47 Misc.2d 741, 263 N.Y.S.2d 354, 358 (N.Y.Sup.1965), *aff'd mem.*, 25 A.D.2d 499, 267 N.Y.S.2d 477 (App.Div.1966). Restraining notices will be vacated where they fail to allege with sufficient specificity the alleged interest that the judgment debtor has in the assets sought to be restrained. *See Claymont v. Levitt*, 140 A.D.2d 578, 528 N.Y.S.2d 644, 645 (App. Div.1988) (finding that plaintiff's "vague, nonspecific statement in his affidavit that the descriptions of 'many' of the articles consigned for sale matched articles he had seen at the defendant's house before the defendant married ... did not satisfy the plaintiff's obligation to produce evidence from which the hearing court could infer that the property sold by the defendant's wife actually belonged to the defendant").

█ The plaintiff argues that restraining notices may be issued to third parties who are alleged to be alter egos of the judgment debtor. The cases upon which the plaintiff relies do not support this proposition. In *Plaza Hotel Assocs. v. Wellington Assocs., Inc.*, 84 Misc.2d 777, 378 N.Y.S.2d 859 (Sup.Ct.1975), the court permitted restraining notices to issue against a bank account held by Wellington Associates, a partnership that claimed to be the successor in interest of Wellington Associates, Inc., the judgment debtor. The plaintiff argues that the decision was based on the court's determination that the plaintiff in that case had made at least a prima facie showing that the partnership was the alter ego of the judgment debtor. *See id.* at 864. However, the court refused to vacate the restraining notices after finding "that plaintiff has demonstrated that the assets held [in the partnership's bank account] are the assets of the judgment debtor, sufficient to warrant the continued restraint of disposition of those assets pending additional enforcement proceedings." *Id.* The court noted in particular

that the plaintiff could pursue, pursuant to N.Y. D.C.L. § 273–a, the restrained assets as fraudulent conveyances made by the judgment debtor. *See id.* In short, the court determined that the plaintiff had made a sufficient showing that the assets were property of the judgment debtor and had been fraudulently conveyed to the alleged alter ego.

The same conclusion was reached in another case relied upon by the plaintiff, *Blue Giant Equip. Corp. v. Tec–Ser, Inc.*, 92 A.D.2d 630, 459 N.Y.S.2d 948 (App.Div. 1983), where the court permitted restraining notices to issue against a third party, whom the plaintiff in the case had made a prima facie showing was the recipient of a fraudulent conveyance by the judgment debtor. In neither of the cases cited by the plaintiff did the court conclude, as the plaintiff here contends, that a third party could be issued restraining notices simply because a prima facie case had been alleged that it has received funds from the judgment debtor's alleged alter ego.

The other cases cited by the plaintiff are equally inapposite. In both *Bingham v. Zolt*, 231 A.D.2d 479, 647 N.Y.S.2d 220 (App.Div.1996), and *ERA Mgmt., Inc. v. Morrison Cohen Singer & Weinstein*, 199 A.D.2d 179, 605 N.Y.S.2d 91 (App.Div. 1993), the court found that restraining notices were properly issued against bank accounts held in the name of third parties, but where the plaintiffs had shown evidence that the accounts held the assets of the judgment debtor. These cases, like the others cited by the plaintiff, support the proposition that a judgment creditor may restrain the assets of a judgment debtor wherever those assets may be. They do not support the proposition that the assets of third parties may be restrained in anticipation of a finding that those third parties are alter egos or hold assets of alleged alter egos of the judg-

ment debtor. Such a conclusion is not only unsupported by the text of N.Y. C.P.L.R. § 5222 or any of the cases cited by the plaintiff, but would also pose significant due process problems.

Therefore, to the extent that the restraining notices issued by the plaintiff affect solely the property of Reich and Jossem, they are improper under N.Y. C.P.L.R. § 5222. Restraining notices under § 5222 may be issued to prevent the disposition of the assets of a judgment debtor, in this case IDTS. But they may not be used as an end-run around the requirements of the prejudgment attachment statutes. Although the plaintiff may attempt to prove the alter ego liability of Reich and Jossem as part of a judgment enforcement proceeding, their assets may not be restrained pursuant to § 5222 until their alleged alter ego status has been adjudicated and their liability for the previous judgment determined.

The restraining notices must therefore be modified to the extent that they purport to affect any property other than that of the judgment debtor, IDTS.

CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is granted in part and denied in part. The defendants' motion to stay the proceeding and compel arbitration is denied. The plaintiff's motion for a preliminary injunction is denied. And the defendants' motion to modify the restraining notices issued by the plaintiff is granted to the extent that the restraining notices are limited to the assets of IDTS.

**SO ORDERED.**